MARINE MIDLAND BANK, Plaintiff,

v.

W. Angie SMITH, Defendant.

MARINE MIDLAND BANK, Plaintiff,

v.

Marius E. ARAKTINGI, Defendant.

Nos. 79 CIV 1612(LBS), 79 CIV 1613(LBS).

United States District Court,
S. D. New York.

Dec. 21, 1979.

Sullivan & Cromwell, New York City, for plaintiff.

Breed, Abbott & Morgan, New York City, for defendants.

## OPINION

SAND, District Judge.

This is an action on a guarantee of a loan made by plaintiff Marine Midland Bank ("Bank") to a coal mining enterprise in which defendants W. Angie Smith ("Smith") and Marius E. Araktingi ("Araktingi") own a major equity interest.[1] Jurisdiction is based on diversity of citizenship.[2] Plaintiff moves for summary judgment pursuant to F.R.Civ.P. 56.

Marine Midland originally brought this action in the Supreme Court of the State of New York. After removal to this Court,[3] the Bank moved for summary judgment on the ground that there was no genuine issue of material fact on the requisite proof of its claims: the guarantees, the underlying debt and default and the nonpayment by the guarantors. In an opinion dated June 13, 1979, this Court found no dispute as to any of those facts. Smith and Araktingi both raised an affirmative defense to the Bank's claim, however, and argued that a factual issue existed as to that defense: that the Bank had fraudulently induced them to

sign the guarantees in May, 1978. Although the Court found "that defendants have produced no facts to substantiate this defense" (Opinion at p. 9), it permitted discovery for sixty days from the date of the Opinion "limited to whether defendants were fraudulently induced by the Bank to execute the amended guarantee in May, 1978" (*id.*).

With discovery complete, plaintiff's motion for summary judgment is now renewed.[4] The Bank seeks full summary judgment in the amount of $4 million based on the May, 1978 guarantees, which were substituted for $2 million guarantees executed in October, 1977. Alternatively, the Bank asks that partial summary judgment be entered in the amount of $2 million if the Court finds that issues of material fact exist with respect to the substituted guarantees. Defendants oppose the summary judgment motion, pray that the complaint be dismissed and assert various counterclaims. Plaintiff in turn moves that the counterclaims be dismissed. We hold that full summary judgment should be granted in plaintiff's favor, and defendants' counterclaims should be dismissed.

## I. BACKGROUND

### A. The Parties and the Partnership Agreement

Atlas-Dirty Devil Mining ("ADDM" or "the Company") is a Nevada general partnership formed for the purpose of carrying out a coal strip-mining project in southeastern Utah. ADDM is owned in equal shares

---

1. There are two companion actions before this Court: *Marine Midland Bank v. W. Angie Smith* (79 Civ. 1612) and *Marine Midland Bank v. Marius E. Araktingi* (79 Civ. 1613). Except for the caption and initial paragraphs, the memoranda and supporting documentation submitted by the parties are identical in the two actions.

2. Marine Midland Bank is a banking corporation organized under the laws of the State of New York and having a principal place of business in the County, City and State of New York. Smith is a citizen and resident of Texas. Araktingi is a citizen and resident of Beirut, Lebanon.

3. This action was commenced in the Supreme Court of the State of New York by a motion for summary judgment in lieu of a complaint pursuant to N.Y.Civ.Prac.Law § 3213 (McKinney 1970). On March 27, 1979, the actions were removed to the federal court. On April 9, 1979, plaintiff made a motion for summary judgment returnable on April 19, 1979.

4. Discovery has been quite extensive. Defendants deposed nine individuals, including four Bank officers. Voluminous documents, as well as affidavits and answers to interrogatories, have also been produced.

by Dirty Devil Mining Company ("Dirty Devil") and Atlas Resources, Inc. ("Atlas"). Dirty Devil is a Nevada corporation which was formed in 1977 in anticipation of entering into a business venture with Atlas to raise the capital to develop and operate a strip coal mine on Utah properties ("the Project") for which Atlas owned the mining leasehold rights. Atlas, a Texas corporation wholly owned by C. B. Woodward ("Woodward"), had acquired leases of coal bearing properties in Wayne and Emery Counties, Utah.

Defendants Smith and Araktingi are two of the five principals concerned with the ADDM Project. Together, they own approximately 40% of the voting stock of Dirty Devil.[5] The other three ADDM principals are John Severson ("Severson") and Grimm Mason ("Mason"), each owners of approximately 20% of the voting stock of Dirty Devil, and Woodward, owner of Atlas and the other general partner of ADDM.

As provided by the partnership agreement, ADDM management was to be "the full and complete responsibility of C. B. Woodward or any other individual appointed by Atlas, and John A. Severson, or any other individual appointed by Dirty Devil . . . ." ¶ 7, Partnership Agreement. Thus, so far as the ADDM Project was concerned, Woodward and Severson were its managers and were the representatives of the two general partners and of the other principals, including the defendant guarantors in this case.

B. *The Loan*

In the summer of 1977, Mason, Severson, John Corette (of Cole, Corette and Bradfield),[6] Woodward and possibly others, entered into discussions with Gary R. Haines ("Haines") and John B. Lyons ("Lyons"), officers of the Bank, concerning a proposed loan by the Bank to ADDM to finance the Project. Negotiations were successfully concluded, and a closing of the loan was held on October 26, 1977 at the Bank's New York offices. Araktingi and Smith attended that closing. Acting on behalf of the Company and its two partners, Woodward and Severson executed a promissory note to the Bank in the amount of $5,500,000 to cover projected capital costs of the Project's construction and development.[7] In addition, joint and several individual guarantees of payment of up to an aggregate of $2 million of the Company's obligations under a Term Loan Agreement were signed by Woodward, Severson, Mason, Araktingi and Smith. (Exhibit 1 to October 9, 1979 affidavit of MacNeil Mitchell, hereinafter cited as "Mitchell Affidavit", pp. 100035–36.)

Also executed at the closing was the Term Loan Agreement itself, which set forth in detail the duties of the Borrower, the obligations of the Bank, and the conditions upon which the personal guarantees were extended. Included as a condition of lending in Article II, Section 3.01(e)(c) of the Term Loan Agreement of October 26, 1977 was a clause providing that the Bank shall have received an original counterpart of the Miller contract. The J. W. Miller Companies ("Miller") were selected by the principals to provide services to ADDM, as described in construction and management contracts between Miller and ADDM. The Bank was not a party to either contract, nor to any other contracts with Miller.

Miller's services to ADDM were terminated in March 1978 by ADDM, acting through Severson and Woodward, the managers of ADDM designated respectively by its partners, Dirty Devil and Atlas (Exhibit 18 to October 9 Mitchell Affidavit). Although Miller's termination would have otherwise violated the Term Loan Agreement, the

---

5. The total capital of the Dirty Devil Corporation was $1,000.00. Smith and Araktingi each made formal equity investments of $205.00 (Exhibit B to October 16 Meiklejohn Affidavit). At all relevant times, Araktingi was vice-president of Dirty Devil.

6. The Washington, D. C. law firm of Cole, Corette and Bradfield received 10% of Dirty Devil's shares in return for legal work. The issued shares were non-voting stock. (Exhibit B to October 16 Meiklejohn Affidavit.)

7. By separate agreement, the Bank advanced $500,000. for use as working capital.

Bank agreed not to declare an event of default.

By the Spring of 1978, it appeared that there would be a cost overrun on the Project and that additional capital had to be found and the bank loan increased if the project was to be completed. In May, 1978, the Term Loan Agreement was amended to increase the loan to $7,450,000. In connection with the increased loan, on May 7, 1978, defendants Smith and Araktingi agreed orally to increase their guarantees to $4 million, confirmed their agreement by telex the next day, and in due course executed and delivered new guarantees identical to the prior $2 million guarantees except for the amount.

The new loan also proved inadequate. In July, 1978, the Bank agreed to lend ADDM another $550,000 and by the end of 1978, the loan was increased by another $200,000. ADDM has since filed a petition under Chapter XI of the Bankruptcy Act.[8]

ADDM's promissory note required principal payments on September 30, 1978 and December 31, 1978. Under Section 5.01 of the Term Loan Agreement, incorporated by reference in the promissory note, a default in any payment due under the note entitles the Bank to declare the note immediately due and payable. No payments having been made, the Bank has made such a declaration.

## II. DISCUSSION

### A. Summary Judgment

Summary judgment is a "remedy to be granted only where the requirements of Rule 56, Fed.R.Civ.P., have clearly been met." United States v. Bosurgi, 530 F.2d 1105, 1110 (2d Cir. 1976). Under Rule 56, it must appear to the court that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(e) provides that "when a motion for summary judgment is supported by the documents listed in Rule 56(c)—depositions, affidavits, answers to interrogatories, and admissions—an adverse party may not rest upon mere conclusory allegations or denials. The party opposing the motion must set forth concrete particulars . . . .". S.E.C. v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978). In determining whether to grant a motion for summary judgment, "the district court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" Id. Moreover, it must "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought . . . .". Schiess-Froriep Corp. v. S. S. Finnsailor, 574 F.2d 123, 126 (2d Cir. 1978); S.E.C. v. Research Automation Corp., supra, 585 F.2d at 33.

In the light of the foregoing principles, the Court will now address plaintiff's motion for summary judgment.

### B. The Termination of the Miller Companies

In its brief of September 24, 1979, the Bank argued that since "neither defendant even raises a defense to liability on the guarantees that they signed in October, 1977, in the amount of $2 million . . . summary judgment should thus be entered in plaintiff's favor in the amount of $2 million if the Court finds that factual issues exist on the $4 million guarantee." Memorandum at p. 5. Subsequently, in their Amended Answer and Counterclaims, defendants raised an affirmative defense to partial summary judgment. Defendants contend that the termination of the Miller companies, without the knowledge or consent of defendants, constituted a material alteration of the Term Loan Agreement between the Bank and ADDM, and "discharges the defendant-guarantors from their original guarantee." Defendants' Joint Memorandum of Law in Opposition to Plaintiff's Motions for Summary Judgment at 50. Defendants argue that "[w]ithout

8. Exhibit 21 to October 9 Mitchell Affidavit.

the involvement of an outside coal mining expert comparable to Miller, they would not have signed the original guarantees of $2 million", *id.*, or the substituted guarantees. *Id.* at 54.

Defendants argue that disputed issues which preclude the grant of summary judgment include: whether the role of the Miller companies was a material part of the Term Loan Agreement; whether they were intended to play a "controlling" role; and whether it was the Bank which "really" discharged the Miller companies.

While in a proceeding for summary judgment we must resolve all ambiguities and draw all inferences on behalf of the opposing party, we find that defendants have failed to establish the existence of any issue of material fact. Examination of the uncontested written instruments shows quite clearly that the termination of the Miller companies does not discharge defendants from any guarantee obligation owed the Bank.

We note, as already indicated, *supra*, that Miller's presence was pursuant to contracts between Miller and ADDM, and not between Miller and the Bank. Moreover, both the construction and management contracts provided that Miller was to supply services "subject to the general control" of ADDM. (Exhibits 5 and 6 to Mitchell Affidavit, pp. 100082, 000412). These contracts limited Miller's authority in various ways, and established spending limits subject to the written authorization of the two general partners, Dirty Devil and Atlas (Exhibit 5, *supra*, p. 100083; Exhibit 6, *supra*, pp. 00412–13). Miller's continued role was at the pleasure not of the Bank but of ADDM; in the final analysis, Miller was discharged by ADDM, through the acts of Severson, representing Dirty Devil, and Woodward, representing Atlas. In short, defendants are not in a position to complain of the Bank that the discharge of the Miller companies was a material alteration of the Term Loan Agreement, when it was in fact defendants' own representatives and fellow principals who were ultimately responsible for the termination. Nor can they complain of the Bank because their own representatives and fellow principals may not have informed them of the Miller discharge.[9]

Finally, the Court notes that whatever views defendants may privately have held about the usefulness of Miller to ADDM, they did not make retention of Miller or any comparable company a condition of the guarantees they gave the Bank. Moreover, Section 6.02 of the Term Loan Agreement signed by both defendants provided that the Bank could refrain from exercising any or all of its rights under its agreements with ADDM (Exhibit 1 to Miller Affidavit, p. 100033). Thus, the termination of the reporting and certification functions which Miller provided for the Bank's benefit under Section 3.02(b) of the Term Loan Agreement (*id.*, p. 100017) cannot serve as a defense to the enforcement of the guarantees.

In sum, the termination of Miller and the alleged failure to secure a comparable replacement does not constitute a defense to enforcement of either the original or the substituted guarantees.

### C. *The Affirmative Defense of Fraud*

Defendants contend that when the Bank recommended that they execute substituted guarantees in May, 1978, it failed to disclose to them, despite express inquiry, material adverse information concerning the financial affairs and operations of the Project. They also allege that the Bank affirmatively misrepresented information and misinformed defendant Smith in response to his specific inquiries made at a time prior to his execution of the new guarantees. Amended Answer, ¶ 20. Defendants argue that had the Bank revealed the material adverse information and not made false assurances, they would not have signed the guarantees. *Id.*, ¶ 23. They claim that the failure of the Bank to disclose material adverse information, as well as its affirmative misrepresentations, operated as a fraud, thereby dis-

---

9. See page 1288, *infra*.

charging them from any liability under the substituted guarantees.[10]

The two conversations which defendants claim were fraudulent were described in defendant Smith's most recent affidavit of October 9, 1979 as follows:

"16. On April 17, 1978, I called Lyons' telephone number at the Bank to inquire about the status of construction at the mine. Haines answered the call instead of Lyons, and I spoke with him for ten minutes. I started the conversation by stating that I was having great difficulty getting information from the mine site, and was therefore seeking it from the Bank. He told me that he or another Bank official had just returned from a visit to the mine, and that there might be some cost overruns, the size of which he was not then certain, but nonetheless assured me that he was 'happy' with the way things were progressing. He said that the Bank was pleased with the Project and that although it would prefer to see construction go faster, he felt that these delays were justified. In response to my inquiry, 'Do you see any problems?', he said there were none other than the justifiable construction delays. Although I had requested advice regarding the status of operations at the Project, Haines never revealed that the Miller companies had been fired with the Bank's permission over three weeks earlier, or that the resulting default under the Term Loan Agreement had been waived by the Bank.

17. Several weeks after my conversation with Haines I met with Severson, who confirmed that there would be construction cost overruns but that the Bank would increase the amount of the loan to cover them. In early May, 1978, just prior to departing for London, I called Corette who told me that the Bank would soon be in touch with us concerning an

10. Paragraph 21 of defendants' Amended Answer and Counterclaim states:

"Upon information and belief, among the material facts and information of which the Bank was aware but concealed from and misrepresented to the defendant, or of which the Bank should have been aware and have disclosed to the defendant in the exercise of the Bank's due professional care and duty, were, *inter alia*,

(a) the termination of the Miller Companies and the fact that they had not been replaced,

(b) gross mismanagement of mine construction and development and mining operations all resulting in large losses and cost overruns to the Company and including, among other things:

(1) redesign of the mining plan by Clifton B. Woodward ("Woodward"), an inexperienced amateur, over the protests of the Miller Companies,

(2) insistence by Woodward, contrary [sic] recommendations of the Miller Companies, of use of an "air jug" preparation plant, instead of a "heavy media" plant for preparing and cleaning coal,

(3) change in the design of the unloading facility at the coal preparation plant by Woodward,

(4) change in original loading plan by Woodward, without approval of the Miller Companies, by use of front end loaders to load prepared coal onto trains,

(5) the faulty and incompetent design of a water well by Woodward despite disagree-

ment with an expert in the field of water well technology hired by the Bank,

(6) the removal of Miller's control over "soft" costs and "hard" costs at the project,

(7) The termination of Hunt Service Company ("Hunt"), the contract miner retained to do the strip mining and the replacement of Hunt by a shell company, the C. C. Coal Company, set up by John A. Severson and John Corette III, neither of whom had any mining expertise,

(8) supervision of construction of roads and buildings by Woodward,

(c) waste of assets of the company, including:

(1) lease of a Cadillac in January, 1978 in the Company's name but for the personal use of Severson,

(2) expenditure of Company funds for the lease or purchase of an airplane which Severson and others used personally.

(d) the precarious financial position of the Company;

(e) the fact that proceeds of the Bank loan were not being used to purchase mining equipment outright; and thus the loan was not collateralized in the manner intended;

(f) the fact that not all the individual guarantors would agree to execute amended guarantees; and

(g) the fact that more funds than had been represented to defendant in May 1978 would be necessary to make the mine operational."

increase in the amount of the loan to the Company to cover these cost overruns.

18. While in London with Dr. Araktingi on or about May 8, 1978, I received word from Severson that Lyons wanted to talk to me, and that I should call him. Dr. Araktingi and I then called Lyons on the transatlantic telephone. After general opening conversation, Lyons stated that the Bank was prepared to increase the loan if the individual guarantors would increase their personal guarantees. I complained to Lyons that Dr. Araktingi and I were having trouble getting information about the mine or the operations. He seemed to become upset over this statement and stated that Dr. Araktingi and I were never available and difficult to reach. In response I stated that I could always be reached through my office in Houston and that Dr. Araktingi had a twenty-four hour answering service. Lyons then said that there had been recent cost overruns at the mine. He proposed an amendment to the Term Loan Agreement raising the commitment to a new total principal amount of $7,450,000, but insisted that a necessary condition was that *all* of the individual guarantors, including Dr. Araktingi and myself, must immediately execute new personal guarantees doubling the aggregate amount of their original guarantees from $2 million to $4 million. Without increased guarantees from all the individuals, we were told, the Bank would not increase the loan.

19. Dr. Araktingi and I were concerned at the increase in our personal exposure, and annoyed that the Bank had not kept us, as guarantors, informed and communicated with us earlier. I therefore questioned whether the additional monies were necessary and, if so, adequate. I expressly asked Lyons if this new loan would straighten out the Company's finances and serve to complete the final development of the Project. He expressly assured me that it *would* suffice to complete construction of the facilities necessary to the mining operation and to place the Project's finances and prospects for success in good order."

### 1. *Non-disclosure Fraud*

Section 6.06 of the Term Loan Agreement provides that New York law governs the Agreement and the rights and obligations of the parties thereunder. Accordingly, this Court looks to New York law in order to determine whether the alleged non-disclosures acted as a fraud upon defendants. *Chemical Bank v. Layne*, 423 F.Supp. 869, 871 (S.D.N.Y.1976).

"It is well settled under New York law that, in certain circumstances, an obligee's failure to disclose material facts to a guarantor or surety will void the obligation. The burden of sustaining the defense is on the guarantor." *Id.* However, it has been held that bonds cannot lightly be avoided, lest they become of comparatively little value. Before a bond can be avoided, "the fraud and bad faith should be brought home to the obligee by quite clear and decisive evidence, otherwise bonds of this character will furnish a very precarious security to the parties who take them." *Bostwick v. Van Voorhis*, 91 N.Y. 353, 361 (1883). See also *Howe Machine Company v. Farrington*, 82 N.Y. 121, 127 (1880). More recently, a court has stated that "[a]bsent a clear showing that a bank was guilty of fraudulent concealment or misrepresentation or circumstances inconsistent with a bona fide transaction, the surety undertaking may not be avoided." *State Bank of Albany v. McDonnell*, 40 A.D.2d 905, 337 N.Y.S.2d 697, 699 (3d Dept. 1972).

The courts have delineated those circumstances in which non-disclosure or silence can make a guarantee unenforceable. Thus, the court held that there was a defense of fraud where a bank did not speak out and correct the false impression which it knew to be entertained by the guarantor, and for which the bank was largely, if not wholly, responsible. *First Citizens Bank & Trust Co. v. Sherman's Estate*, 250 App.Div. 339, 294 N.Y.S. 131, 139 (4th Dept. 1937). The court stated that fraud was found to exist where non-disclosure or concealment of facts amounted to a "deliberate suppres-

sion of the truth." *Id.* The obligee "must not intentionally mislead . . . [sureties] by what he says or does, or omits to say or do, and bad faith only on his part, which has misled the surety to his damage, will enable the surety to defend against the bond." *Bostwick v. Van Voorhis, supra,* 91 N.Y. at 362.

■ Consistent with the holding that guarantors may not easily avoid their obligations, courts have also made it clear that duties of inquiry and awareness fall upon the guarantor. *Chemical Bank v. Layne, supra,* 423 F.Supp. at 871. Thus, in applying New York law, the court in *Mohasco Industries, Inc. v. Giffen Industries, Inc.,* 335 F.Supp. 493, 497 (S.D.N.Y.1971) stated: "The obligee is not under an obligation to disclose to a surety information of which the surety has knowledge readily to hand. A surety cannot 'rest supinely, close his eyes, and fail to seek important information' and then seek to avoid liability under the guaranty by claiming he was not supplied with such information. *Magee v. Manhattan Life Insurance Co.,* 92 U.S. 93, 23 L.Ed. 699 (1876)." The duty of awareness upon the guarantor is even greater when the guarantor is not an independent third party, but owns a substantial interest in the enterprise for which he is a surety. Thus, in a recent case, the Supreme Court, Appellate Division, held that a defendant, who assumed a controlling interest in a corporation and signed as personal guarantor on its note, could not defeat liability as guarantor on the asserted theory that he had been induced into the transaction by a bank official's misrepresentations. *Marine Midland Bank v. Palm Beach Moorings,* 61 A.D.2d 927, 403 N.Y.S.2d 15 (1st Dept. 1978). Noting that the guarantor had had opportunity to examine the corporate records, the court found the following principle in *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 322, 184 N.Y.S.2d 599, 603, 157 N.E.2d 597, 600 (1959) to be controlling:

"If the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations."

Plaintiff argues that the principles enunciated by the courts as just described, *supra,* compel the enforcement of defendants' guarantees. Defendants, however, relying on *Chemical Bank v. Layne, supra,* 423 F.Supp. at 879, contend that "[h]aving made inquiry as to the status of operations at the mine, Smith and Araktingi were entitled to full disclosure by the Bank of the status of operations at the mine. They did not receive such disclosure and thus should be discharged from any liability under the guarantees." Defendants' Joint Memorandum at 57. Cognizant of the principle that each case turns on its own circumstances, *Donovan v. Aeolian Co.,* 270 N.Y. 267, 200 N.E. 815, *reh. denied,* 271 N.Y. 532, 2 N.E.2d 681 (1936), we believe that *Chemical Bank* can be readily distinguished and is not here controlling.

In *Chemical Bank,* the court held that the guarantee was unenforceable because, after the guarantor's specific inquiry about the stock collateralizing the loan, the bank, through non-disclosure and misrepresentation, still permitted the guarantor to entertain the impression that the stock was unrestricted, when in fact the bank knew otherwise.

We deal here with circumstances which are markedly different from those which existed in *Chemical Bank.* For the purpose of evaluating a summary judgment motion, we accept as true the most recent and detailed version of Smith's two conversations with the Bank officials[11], page 1285, *supra,* though this version is not corroborated in significant respects by the deposition testimony of Haines and Lyons. By his own account, Smith simply asked if Haines saw problems and if Lyons thought the addition-

---

11. Smith's affidavit of May 2, 1979 does not indicate that Smith complained to Lyons that

he and Araktingi "were having trouble getting information about the mine or the operations".

al loan would be sufficient; Haines said he was "happy" and Lyons "assured" Smith the loan would be sufficient. The record does not show or suggest that Haines was not "happy" with progress, with the qualifications stated by him, or that Lyons did not believe the additional loan would be sufficient. The internal bank documents recommending and approving the additional loan are consistent with what Haines and Lyons are said to have told defendants. (Exhibits 19, 20 to Mitchell Affidavit.) At the same time, the conversations made clear to defendants that there had been cost overruns. Moreover, "[t]he very fact that a bond was being required was in itself sufficient to put the defendants on notice that [their company's] financial responsibility was questioned by the bank." *Security National Bank of Long Island v. Compania Anonima de Seguros*, 21 Misc.2d 158, 161, 190 N.Y.S.2d 820, 823 (Nassau Co. 1959), *aff'd* 10 A.D.2d 872, 199 N.Y.S.2d 532 (2d Dept. 1960), *app. denied*, 10 A.D.2d 1002, 205 N.Y.S.2d 811 (2d Dept. 1960).

■ In light of the foregoing, it is clear that defendants' attempt to raise a non-disclosure fraud defense on the basis of *Chemical Bank* is unpersuasive. *Chemical Bank* does not involve only a failure to disclose on the part of the lending institution. There, in answer to an inquiry from the prospective guarantor, the bank representative affirmatively advised that the value of the stock held as collateral was the market price of registered stock although, as the bank was in a peculiar position to know, the stock which it in fact held was restricted. See *Chemical Bank v. Layne, supra*, 423 F.Supp. at 876. No such affirmative misrepresentation of facts which the bank knew or should have known to be false is present here. See pages 1288-1289, *infra*.

We are also unpersuaded by defendants' non-disclosure fraud defense because in or-

der to prove a case of fraud by silence, defendants must show that the Bank had a duty to tell what it allegedly withheld. However, Smith and Araktingi do not stand in the same position as accommodation guarantors and they cannot assert equitable defenses available to a third-party surety, who has no relationship with the parties except for his bond. Defendant-guarantors here are principals of the underlying borrower whose indebtedness they guarantee. ADDM was their partnership; they had a 40% equity interest in one of the two general partners; ADDM's managers were their designees, partners and fellow principals and they cannot complain of the Bank that these individuals mismanaged their Project or wasted their assets; they had the power to control ADDM; they knew or had the means of knowing its condition at all times.[12] In short, given the inherent nature of their relationship with the company to which they gave their unconditional guarantees, defendants cannot successfully contend that the Bank had a fiduciary duty toward them. Hence, we conclude that the defense based on the charge of silence is insufficient as a matter of law[13].

## 2. Affirmative Misrepresentations

■ In addition to their contentions of non-disclosure fraud, defendants also argue that the Bank's alleged affirmative misrepresentations concerning the conditions and sufficiency of the increased loan fraudulently induced them to sign the substituted guarantees in May, 1978.

Defendants Smith and Araktingi claim that in his telephone conversation with them on May 8, 1978, Lyons insisted that the Bank would require all of the original five guarantors to execute the increased guarantees as a condition of any increase in the loan to ADDM. In fact, on April 28, 1978, the Bank's Corporate Banking Divi-

---

12. For example, Smith spoke to one of his partners, Severson, about the project shortly before the May, 1978 increase in the guarantees and after the April, 1978 conversation. October 9 Smith Affidavit, ¶ 17, p. 10, *supra*.

13. Even if the legal theory on which defendants proceed was viable, it is certainly debatable as to whether incidents listed in ¶ 21(b) of the Amended Answer could fairly be characterized as "gross mismanagement".

sion Credit Committee had approved the increase in the loan to the Company without requiring increases in personal guarantees. The Credit Committee indicated that on a "best efforts basis", an "attempt" would be made to secure increased personal guarantees. Exhibit 20 to Mitchell Affidavit. The Bank never obtained a $4 million guarantee from Woodward. Defendants contend that on "the understanding that their guarantees were expressly required, they consented because they felt that otherwise, the Bank would not continue to fund the Project." Defendants' Joint Memorandum at 60, citing *Baer American Banking Corp. v. Farkas*, New York Law Journal Nov. 20, 1979, p. 7, col. 1 (S.Ct. N.Y.Co. Special Term, Pt. I). Defendants argue that their reliance on an affirmative misrepresentation of a material fact on the part of the Bank operates to discharge them from any liability under the guarantees. We reject defendants' contention. We find that *Baer American Banking* is easily distinguished, because in that case, the plaintiff bank allegedly told the defendant guarantor "that the guarantee of one Edward Herling had already been obtained", when in fact, it had not. In the case before us, however, there is no claim that the Bank told defendants Smith or Araktingi that Woodward or any other person had given an increased guarantee or had agreed to do so. There is no contention that defendants' guarantees were given in the belief that all the others had been obtained. The record does not disclose a misrepresentation by the Bank, but an effort to obtain as much security as possible for the loan increase. The fact that the Bank was able to obtain better terms for the loan increase than they might have been willing to accept does not create a ground for a fraud claim.

Finally, we are also unpersuaded by defendants' claim that Lyons' "assurance" on May 8, 1978 that the additional loan money would suffice to make the mine operational constituted a misrepresentation. Lyons

was not guaranteeing the Project's success; he was asking for guarantees from Smith and Araktingi. Moreover, it is also clear that the Bank would not have lent any additional money if it had not thought that defendants' Project would be successful, and as noted, *supra*, that belief is reflected in the Bank's documents recommending and approving the loan (Exhibits 19, 20 to Mitchell Affidavit).

### D. *Failure to Deliver the "Keplinger Report"*

■ Defendants contend in their Amended Answer and Counterclaims that the Bank has "withheld" from them the Keplinger Report, a study prepared for the Bank by one of its consultants in early 1979. Defendants allege that they "had a legitimate and bona fide need for the Keplinger Report in seeking a purchaser or other investor for the Project willing and able to cure any default of the Company to the Bank and place the mining operations in a sound financial and operational condition." ¶ 49. As an affirmative defense, defendants argue that by "withholding" the Report, the Bank prevented them from exonerating their obligation as guarantors and damaged them in a presently unascertained amount. ¶ 50.

It is not alleged that defendants had any contractual right to the Report, nor is it suggested as to how, absent a contract, a duty to disclose the Report to defendants arose.[14] Defendants allege that the cost of preparing the Report had been "charged against the Company's indebtedness". A borrower traditionally pays the cost of furnishing any data required by the lender. This does not impose an obligation of disclosure on the lender's part.

### E. *Counterclaims*

In their Amended Answer and Counterclaim, defendants assert three counterclaims. We dismiss all three counterclaims.

---

**14.** Apparently, the Keplinger Report has in fact been disclosed to ADDM in connection with the bankruptcy proceedings pending in Utah, and has been disclosed to defendants as part of discovery in this action. Memorandum of Plaintiff in Support of its Motion to Dismiss Counterclaims at p. 9.

In their first counterclaim, defendants contend that having taken over "from the Company active and absolute control of all operational, financial and managerial decisions relating to the Project", ¶ 28, the Bank "aided and abetted breaches of fiduciary duty and acts of waste and mismanagement by officers and employees of the Company; and as a result contributed to the inability of the Company to repay its loan and precipitated its alleged default on the loan obligation." ¶ 29. Defendants further argue that they lost their equity in the Project and have been damaged in a presently unascertained amount because "[t]he Bank, having aided and abetted the mismanagement and spoliation of the Company . . . contributed to the Company's production failure, its default on the Bank loan and its subsequent bankruptcy." ¶ 31.

We dismiss the first counterclaim because defendants have failed to demonstrate that plaintiff's conduct falls within the definition of "aiding and abetting". That definition provides that "for harm resulting to a third person from the tortious conduct of another, a person is liable if he . . . (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Restatement, Torts § 876 (1939), cited in *Fischer v. New York Stock Exchange*, 408 F.Supp. 745, 752 (S.D.N.Y. 1976); *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 886 (3d Cir. 1975). See also *Edwards & Hanly v. Wells Fargo*

*Securities, etc.*, 602 F.2d 478, 483, n. 5 (2d Cir. 1979) (citing Restatement).[15] Defendants' pleadings, however, even as amended, allege no breach by any one of a fiduciary duty to Smith or Araktingi, except in the conclusory terms of paragraph 22.[16] Although defendants argue in their Joint Memorandum of Law in Opposition to Plaintiff's Motions to Dismiss Counterclaims (at page 7) that sufficient particularity is provided in paragraph 21,[17] what is claimed in paragraph 21 is mismanagement, not breach of fiduciary duty. Even if such mismanagement does constitute a breach of fiduciary duty, the record before us does not suggest that the Bank which increased its loan to defendants' company by approximately $2 million was aware of conduct which it knew to constitute a breach of duty. Moreover, beyond the conclusory allegations in the Amended Answer, the record before us does not support a contention that the Bank gave substantial assistance or encouragement to the breaching of a fiduciary duty.

Defendants' second[18] and third[19] counterclaims are predicated upon a finding of fraud. This Court has already concluded that the actions of the Bank did not operate as a fraud upon defendants;[20] accordingly, the second and third counterclaims are dismissed.

## CONCLUSION

The basic fallacy in defendants' position is that it ignores the nature of the relation-

---

**15.** Courts have borrowed the concepts of the common law in establishing aider and abettor liability for securities violations. See *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47–48 (2d Cir. 1978); *Goldberg v. Meridor*, 81 F.R.D. 105, 111 (S.D.N.Y.1979).

**16.** Paragraph 22 of the Amended Answer and Counterclaims states: "Upon information and belief, the Bank knew of and concealed from defendant[s] information which concerned breaches of fiduciary duty by the officers and employees of the Company directly involved in day to day operations at the Project."

**17.** See page 1285, fn. 10, *supra*.

**18.** Defendants bring their second counterclaim under § 10(b) of the Securities Exchange Act of 1934, as amended and Rule 10b–5 promulgated

thereunder. They allege that they were induced to pledge their shares in Dirty Devil to the Bank as collateral security for the loans extended by the plaintiff to ADDM as a result of the Bank's fraudulent acts and omissions. Plaintiff contends that defendants cannot state a claim under the federal securities laws because they are not a purchaser or seller of a security; given the Court's finding that the Bank's conduct did not operate as a fraud or deceit, there is no need for us to reach this issue.

**19.** The third counterclaim seeks to recover for damages suffered as a result of plaintiff's allegedly fraudulent conduct.

**20.** See pages 1288–1289, *supra*.

ship between the parties. Defendants ignore the fact that they are not mere accommodation guarantors, but are principals of the underlying borrower whose indebtedness they guarantee. Moreover, they seek to convert the terms which the Bank exacted for its benefit [21] into safeguards for the benefit of the guarantors but disregard the Bank's right to waive those provisions. We recognize that in extraordinary circumstances, a lending institution's deception of the guarantors may provide them with a defense. *Chemical Bank v. Layne, supra,* was such a case [22]. But *Chemical Bank* constitutes the exception, not the rule, and absent deception of such magnitude, conversion of the terms of a bank loan from safeguards for the lender into a shield for the guarantors will seriously disrupt important commercial needs and understandings.

Expedition is appropriate in actions against guarantors where no valid defenses requiring trial are asserted. Delay may significantly diminish the value of the added security which the lender would otherwise derive from the guarantee. Plaintiff initially invoked the accelerated state court procedure of a motion for summary judgment in lieu of complaint. Removal to federal court should not be a reason for automatic delay. As this Court stated in a decision granting summary judgment against a guarantor, the federal courts should not become a "haven for the dilatory debtor". *Spencer Foods v. Rogliano and Rogliano,* 78 Civ. 2070 (LBS) (July 17, 1978 S.D.N.Y.) (Slip Op. at 5). See also *S.E.C. v. Research Automation Corp., supra,* 585 F.2d at 33. This concern is of particular significance at times, such as these, when soaring interest rates increase the incentives for delay on the part of debtors.

Motion for summary judgment in the amount of $4 million is granted.

Counterclaims dismissed.

SO ORDERED.

21. See page 1284, *supra.*

22. See pages 1287-1288, *supra.*