**Mishal BIN SAUD, Plaintiff,**

v.

**The BANK OF NEW YORK, Michael J. Fitzpatrick and John Does 1–10, Defendants.**

**No. 89 Civ. 148 (RJW).**

United States District Court, S.D. New York.

April 9, 1990.

Richard K. Bernstein Associates, New York City, Richard K. Bernstein, of counsel, for plaintiff.

Spengler, Carlson, Gubar, Brodsky & Frischling, New York City, Sarah S. Gold, Jennifer B. Ungar, of counsel, for defendant Bank of New York.

## OPINION

ROBERT J. WARD, District Judge.

Plaintiff Mishal Bin Saud ("Bin Saud"), filed a civil action under the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.*, alleging that defendants' fraudulent activity resulted in his decision to guaranty a $42 million development loan and his subsequent $19,071,196.51 liability under that guaranty.[1] The Bank of New York ("BONY") has moved to dismiss the amended complaint, arguing that plaintiff is barred by the doctrine of *res judicata* from asserting this claim. For the reasons that follow, BONY's motion is granted and plaintiff's amended complaint against BONY is dismissed.

## BACKGROUND

Bin Saud, a Saudi Arabian prince, guarantied a $42 million loan by defendant BONY, a New York corporation, to Indeco Holdings Solymar, Inc. ("Indeco Solymar"), a development company in the State of Florida. Indeco Solymar is wholly owned by its corporate parent, Indeco Holdings, Ltd. ("Indeco Limited"), which is in turn owned 50%–50% by two corporations each of which is either owned by Bin Saud or his partner Lester Colodny ("Colodny"). According to BONY, Bin Saud is an officer and director of Indeco Solymar and Bin Saud, or his agents, had joint control over all of Indeco Limited's operations relating to Indeco Solymar. Defendant Michael J. Fitzpatrick ("Fitzpatrick") is a former BONY Assistant Vice President and loan officer. Defendant John Does 1–10 are unidentified employees of Indeco Solymar.

In the amended complaint, Bin Saud alleges that Fitzpatrick accepted bribes from the John Doe employees of Indeco Solymar in return for ignoring or modifying certain loan conditions and standards. In 1980 and 1981, Fitzpatrick allegedly negotiated and obtained approval from BONY for land acquisition loans and a $35.2 million building construction loan for the development of Solymar Place, a high rise condominium in

Miami Beach, Florida.[2] In or around 1981, two land acquisition loans were made to Indeco Limited in the amounts of $4.2 and $2.6 million. The construction loan was not disbursed at that time. Fitzpatrick allegedly caused $120,000 of the initial land acquisition funds to be diverted to his own use, and deposited this money in a Panamanian bank account.

Fitzpatrick's diversion of loan proceeds was not limited to the Indeco Solymar loans. Plaintiff maintains that Fitzpatrick also diverted portions of loans from a number of other projects he was supervising which were unrelated to Indeco Solymar or to Bin Saud. After an internal investigation in or about November 1982, BONY uncovered that Fitzpatrick had been diverting loan proceeds, and asked him to resign from his position with the bank.[3] Bin Saud maintains that while Fitzpatrick resigned from the bank in November 1982, BONY never informed him of the diversion of funds or the failure of Indeco Solymar to meet certain conditions specified in the loan agreements.

In or about December 1982, BONY, through James Hamilton, Fitzpatrick's supervisor, signed a commitment letter for the approval of the $35.2 million loan. The $6.8 million in prior land acquisition loans to Indeco Limited were consolidated and assigned to Indeco Solymar, bringing Indeco Solymar's total indebtedness to $42 million. Upon the closing of the loan on or about June 30, 1983, Bin Saud signed a guaranty obligating himself for the full value of the consolidated loan in the event of Indeco Solymar's default.

Indeco Solymar subsequently defaulted on the loan. BONY served Indeco Solymar with notice of acceleration of the loan and a demand for payment in full of the outstanding principal and interest. When no payment was forthcoming, BONY com-

---

1. Bin Saud has also asserted a pendent state law fraud claim.

2. Referred to in the original complaint as "Solymar at Place Mishal." Complaint, filed January 9, 1989, ¶ 7.

3. Fitzpatrick's actions with respect to certain transactions in Rhode Island unrelated to Bin Saud's guarantee resulted in his conviction on October 28, 1988 in the U.S. District Court in Rhode Island for violating the Interstate and Foreign Travel or Transportation in Aid of Racketeering Enterprises Act, 18 U.S.C. § 1952.

menced a lawsuit against Indeco Solymar in the Circuit Court for the Eleventh Judicial District for Dade County, Florida. In that action, Indeco Solymar consented to a final judgment of foreclosure and admitted its default under the financing agreements with BONY in the amount of $24,398,-086.43.

At the same time, BONY commenced an action on Bin Saud's guaranty in the United States District Court for the Southern District of New York.[4] Bin Saud filed an answer and impleaded Indeco Limited, co-guarantor of the loan, and Indeco Solymar. Indeco Limited and Indeco Solymar answered and filed counterclaims against Bin Saud alleging his breach of fiduciary duties as an officer and director of these entities. No counterclaims or crossclaims were filed against BONY.

On February 24, 1987, BONY moved for summary judgment in the Guaranty Action. The return date for the motion was adjourned until April 17, 1987. Shortly before the adjourned date, Bin Saud discharged his attorneys. He then failed to retain replacement counsel and failed to submit any papers in opposition to BONY's motion. Accordingly, the court entered an order, dated April 21, 1987, granting BONY's summary judgment motion on default, but providing that a motion to open the default would be entertained if made on or before May 8, 1987.

On May 8, 1987, an attorney, Alexander Aghayan ("Aghayan"), submitted a letter to the court on Bin Saud's behalf. The letter explained that Aghayan was not acting as Bin Saud's counsel of record, but stated that Bin Saud would be properly represented by counsel shortly. The court treated Aghayan's letter as a motion to open the default, returnable May 22, 1987.

On May 22, 1987, Aghayan caused two letters, both signed by Bin Saud and dated May 19, 1987, to be delivered to the court. These letters specifically requested that the court treat them as motion papers, and then proceeded to outline Bin Saud's arguments for opening the default.

After considering these letters, the court found no basis for opening the default and entered judgment, on June 24, 1987, in favor of BONY against Bin Saud in the principal amount of $19,071,196.51 plus interest. Bin Saud did not appeal from this judgment.[5]

Plaintiff originally filed this RICO complaint on January 9, 1989. In a Memorandum Decision dated June 23, 1989, this Court denied BONY's motion to dismiss the complaint for failure to plead fraud with particularity. This denial was without prejudice to renewal pending completion of limited discovery and the filing of an amended complaint. At that time, the parties had not fully addressed the question of whether *res judicata* might bar this claim in the event plaintiff was able to replead the fraud allegations with sufficient particularity to satisfy Rule 9(b), Fed.R.Civ.P. The Court noted that the prior judgment raised serious questions regarding the propriety of this action, and directed that, in the event an amended complaint was filed, it:

> should contain factual allegations concerning plaintiff's knowledge at the time of the [Guaranty Action] regarding BONY's alleged fraudulent conduct, the reasons for any claimed lack of knowledge, including any allegations concerning fraudulent concealment by defendants, and the steps, if any, taken to discover the alleged fraud.

4. *The Bank of New York v. Mishal Bin Saud,* 84 Civ. 3681 (ADS) (hereinafter "the Guaranty Action").

5. After obtaining the judgment, BONY instituted foreclosure proceedings on property owned by Bin Saud in Paris, France. On June 8, 1988, the judgment entered in favor of BONY in the guaranty action was "domesticated" and rendered enforceable in France by the Tribunal D'Instance de Paris. The French judgment authorized BONY to execute on any property of Bin

Saud's in France and (i) to sell at public auction, Bin Saud's personal property contained in his Paris apartment and (ii) to convert a prejudgment lien on the apartment to an execution lien. Following service of the judgment, Bin Saud filed an appeal in the fall of 1988. In his appellate papers, he advised the French court of this RICO action and specifically requested that the French court stay the foreclosure proceedings pending resolution of this action.

*Id.* at 12. Plaintiff subsequently filed his amended complaint on September 6, 1989. BONY now challenges the amended complaint, arguing that the judgment in the Guaranty Action precludes the instant RICO claim.

## DISCUSSION

■ Under *res judicata,* or claim preclusion,[6] a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Federated Department Stores v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427–28, 69 L.Ed.2d 103 (1981). *See also Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 466–67 n. 6, 102 S.Ct. 1883, 1889–90 n. 6, 72 L.Ed.2d 262 (1982). *Res judicata* "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980). *See also Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979) (dual purpose of *res judicata* to protect litigants from the burden of relitigation and to promote judicial economy). As the Supreme Court has stressed,

> "[the] doctrine of *res judicata* is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, 'of public policy and of private peace' which should be cordially regarded and enforced by the courts."

*Federated Department Stores v. Moitie, supra,* 452 U.S. at 401, 101 S.Ct. at 2429 (quoting *Hart Steel Co. v. Railroad Supply Co.,* 244 U.S. 294, 299, 37 S.Ct. 506, 507–08, 61 L.Ed. 1148 (1917)).

■ *Res judicata* prevents litigation of all grounds for recovery, or defenses to recovery, that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding. *Brown v. Felsen,* 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979). In order to promote the goal of finality in judgments, an unappealed judgment on the merits will have *res judicata* effect even through the judgment was erroneous, or rested on a legal principle subsequently overruled in another case. *Federated Department Stores v. Moitie, supra,* 452 U.S. at 398, 101 S.Ct. at 2427–28. Nonetheless, to avoid an overly rigid application of the doctrine, a court should carefully consider the facts at issue before it erects a *res judicata* bar. *Brown v. Felsen, supra,* 442 U.S. at 132, 99 S.Ct. at 2209–10.

■ In this case, there is no dispute that BONY and Bin Saud were parties to the Guaranty Action or that the court in the Guaranty Action entered a final judgment on the merits in BONY's favor. *See* 1B J. Moore, J. Lucas, T. Currier, *Moore's Federal Practice* ¶ 0.409[4] (2d ed. 1988) (a judgment obtained by default is a final judgment on the merits, and of a kind to operate as a bar to subsequent actions). Thus, if Bin Saud's RICO claim is based upon the same cause of action presented in the Guaranty Action, it will be barred by *res judicata.*

> The Second Circuit has adopted a broad view of what constitutes the same cause of action. Actions need not be identical; they only need be integrally related. In assessing claims, the Court considers several related factors, not one of which is necessarily dispositive, including: (1) whether the same transaction or connected series of transactions is at issue; (2) whether the same evidence is needed to support both claims; and (3) whether the facts essential to the second action were present in the first.

*G & T Terminal Packaging Co., Inc. v. Consolidated Rail Corp.,* 719 F.Supp. 153, 157 (S.D.N.Y.1989) (citing *N.L.R.B. v. Unit-*

---

**6.** Preclusion occurs under two theories: claim preclusion and issue preclusion. Claim preclusion bars relitigation of claims or issues which were or could have been raised in a prior suit on the merits between the same parties or their privies. Issue preclusion, or collateral estoppel, prevents relitigation of a matter of fact or law that was previously litigated and decided. *See generally,* 1B J. Moore, J. Lucas, T. Currier, *Moore's Federal Practice* ¶ 0.405[1] (2d ed. 1988).

ed Technologies Corp., 706 F.2d 1254, 1259 (2d Cir.1983)). See also Restatement (Second) of Judgments § 24 (1982) (a claim will be deemed to be same as a prior cause of action for res judicata purposes when it arises from the same transaction).

Although an examination of the Guaranty Action indicates that no RICO claim was expressly asserted by Bin Saud against BONY, this fact is not dispositive. The crucial element in determining whether a newly asserted claim is based on the same cause of action as a previously decided claim is "the factual predicate of the several claims asserted. For it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies." Expert Electric Inc. v. Levine, 554 F.2d 1227, 1234 (2d Cir.), cert. denied, 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977); see also In re Teltronics Services, Inc., 762 F.2d 185, 193 (2d Cir.1985) ("[n]ew legal theories do not amount to a new cause of action so as to defeat the application of the principle of res judicata"); N.L.R.B. v. United Technologies Corp., supra, 706 F.2d at 1260.

In Cullen v. Paine Webber Group, Inc., 689 F.Supp. 269, 279 (S.D.N.Y.1988), the plaintiffs filed a RICO action, but many of the claims underlying the RICO action were previously raised as defenses or counterclaims in certain arbitration proceedings between the parties or their privies. The district court concluded that the arbitration proceedings would support the application of res judicata and found that the RICO claims were precluded.

Although the defenses and counterclaims of [plaintiffs] in the arbitration proceedings were not framed as a RICO action, nor were the allegations characterized as acts of mail, wire, and securities fraud as is true in this complaint, it is fair to conclude that there was, nevertheless, an identity of issues as that phrase is used in res judicata decisions. In both cases the claims alleged and the allegations all arose from the same transaction, that is, [defendant's] hiring and discharge of the plaintiffs. Even though in the arbitration plaintiffs did not raise all the claims presented in this case, res judicata is nevertheless applicable because the plaintiffs could have raised in the arbitration proceedings every claim underlying their RICO cause of action.

Id. The RICO action was barred even though the plaintiffs had alleged a broader scheme to defraud than that asserted in the arbitration proceeding. Id.

Moreover, when a party fails to raise the defense of fraud in an initial action, a subsequent collateral challenge to an adverse judgment rendered in that initial action under the guise of a fraud based RICO claim may be barred by res judicata. See Henry v. Farmer City State Bank, 808 F.2d 1228, 1232–35 (7th Cir.1986) (RICO claim based on alleged fraud in securing a mortgage barred by res judicata where plaintiff had not raised fraud as a defense in prior state foreclosure proceedings); Rudell v. Comprehensive Accounting Corp., 802 F.2d 926, 928 (7th Cir.1986) (plaintiffs' claim that they were fraudulently induced to enter a franchise agreement in violation of RICO barred by res judicata because they failed to raise their fraud claims as a defense in an earlier arbitration proceeding and the successful prosecution of the fraud action would nullify rights established by the initial judgment), cert. denied, 480 U.S. 907, 107 S.Ct. 1351, 94 L.Ed.2d 521 (1987).

■ The fraud charges Bin Saud has levelled at BONY arise from the same transaction as the guaranty—indeed they are intimately tied to the execution of the guaranty—and would have been defenses to BONY's claim in the Guaranty Action. Bin Saud does not dispute that the failure to raise the defense of fraud in a prior action may, in the ordinary course, preclude a party from asserting a fraud based RICO claim in a later suit. Instead, he maintains that the RICO claim asserted in this action is proper principally because he was unaware of the relevant facts implicating BONY in the alleged scheme to defraud at the time of the Guaranty Action, and only recently became aware of the full extent of Fitzpatrick's illegal activity and

BONY's alleged participation in these frauds.[7]

The Court agrees that *res judicata* may well be inappropriate where the facts underlying the later claim were not present in the prior action, *N.L.R.B. v. United Technologies Corp., supra,* 706 F.2d at 1260, were fraudulently concealed or could not have been discovered through the exercise of due diligence. *Guerrero v. Katzen,* 774 F.2d 506, 508 (D.C.Cir.1985). The record in the Guaranty Action, however, belies Bin Saud's claimed lack of knowledge. Indeed, upon inspecting Bin Saud's submissions in the Guaranty Action, it is apparent that he had notice of the essential facts upon which the current RICO claim is based during the pendency of the prior lawsuit.

The factual predicate for Bin Saud's RICO claim against BONY is that BONY knew of Fitzpatrick's diversion of loan funds and failed to disclose this information to Bin Saud prior to his executing the $42 million guaranty. Put another way, Bin Saud claims BONY participated in a cover up of Fitzpatrick's frauds by failing diligently to investigate the irregularities which occurred in the loan projects Fitzpatrick had supervised, including the loans relating to Solymar Place, and by failing to inform him, prior to the execution of the guaranty, that Fitzpatrick had diverted money from the loans and that certain preclosing conditions for the loans had not been satisfied by Indeco Solymar.

The essential facts which constitute these allegations of fraud by BONY were voiced by Bin Saud in his Answer filed in the Guaranty Action and in his letter-motion to open the summary judgment granted to BONY on default. The first affirmative defense raised by Bin Saud in the Guaranty Action stated that:

[i]t therefore appears that BONY made the first advance and all subsequent advances under the Building Loan Agreement with the knowledge that none of the above mentioned conditions to BONY's obligation to make the first advance had been satisfied.

Answer and Third–Party Complaint, annexed as Exhibit A to Memorandum in Support of Motion, filed September 28, 1989. This allegation indicates Bin Saud's knowledge that BONY never required Indeco Solymar to satisfy the conditions stated in the loan agreements prior to advancing the funds. The RICO claim is premised, in large part, on BONY's alleged failure to notify Bin Saud of the unsatisfied loan conditions prior to his execution of the guaranty.

In the letter-motion, Bin Saud elaborated on the "good grounds" he had for seeking to open the default by outlining many of the same facts he now claims constitute fraud on BONY's part. Exhibit D, annexed to Memorandum in Support of Motion, filed September 28, 1989. Bin Saud stated that he had been advised that Fitzpatrick had diverted $400,000 which he had paid to BONY as a brokerage fee for the loans to a Panamanian company, and concluded that it "would appear that there has been a conspiracy between Lester Colodney and [Fitzpatrick], which has caused considerable harm to my interests." *Id.*

Bin Saud continued to recite his knowledge of the alleged fraud regarding the guaranty.

In the first place, it would seem to be no coincidence that the Bank approved the loan without the other collaterals, relying only on my guarantee, without my being informed of this. It has been apparent that other Bank of New York Officers were aware of this situation and in looking into this matter further it has come to light that the same Michael Fitzpatrick made a further similar arrangement af-

---

**7.** In response to the Court's direction that Bin Saud particularize his knowledge of BONY's involvement in the alleged fraud in repleading his complaint, the amended complaint contains the conclusory allegation that:

[t]he first evidence of wrongdoing by BONY and Fitzpatrick came to plaintiff's attention as a result of the criminal proceedings brought against Fitzpatrick in Rhode Island. An examination of the Federal Court records and transcripts in that case in Rhode Island led to the discovery of wholesale misconduct by Fitzpatrick.

Amended Complaint, filed September 6, 1989, at ¶ 63.

ter leaving the Bank of New York and becoming an Executive of the State Loan and Saving Association of California, providing further unsecured loans to Lester Colodney, with a similar intermediary company in Panama

....

As a result of this conspiracy, I understand now that my efforts to seek assistance from the Bank of New York in verifying the funds drawn down by Lester Colodney for the purpose of the Solymar Project were of little avail.... I consider there has been a serious breach of a duty of care by the Bank, which would go to reduce considerably the amount of money that could be rightfully claimed by the Bank against me, on the basis of my guarantee.

*Id.*

From Bin Saud's submissions in the Guaranty Action it is evident that he was aware of the essential facts which surround the fraud allegations asserted against BONY in the amended complaint. While the facts surrounding the alleged fraud by BONY are embellished in the amended complaint, they arise directly from the substance of facts Bin Saud knew at the time of the Guaranty Action. Bin Saud cannot avoid *res judicata* by reformulating the facts he submitted to the court in the Guaranty Action into the mold of a RICO claim. *See In re Teltronics Services, Inc., supra,* 762 F.2d at 192–93; *Cullen v. Paine Webber Group, Inc., supra,* 689 F.Supp. at 279.

■ Nonetheless, Bin Saud argues that BONY's failure to disclose the extent of Fitzpatrick's misdeeds and its knowledge of Indeco Solymar's failure to satisfy certain loan conditions prevented him from discovering the full extent of BONY's role in the alleged fraud. Despite the Court's instruction, the amended complaint contains only conclusory statements of fraudulent concealment by BONY, and fails to plead with particularity the circumstances surrounding the concealment or any diligent efforts Bin Saud undertook to uncover the information that he claims was concealed. Moreover, Bin Saud's submissions

in the Guaranty Action demonstrate that he was aware of the essential facts regarding the alleged frauds relating to the guaranty. At the very least, this information created a duty to investigate the matter further. *See Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983) (where the circumstances suggest to a person of ordinary intelligence that he has been defrauded, a duty of inquiry arises, and if that inquiry is not undertaken, knowledge of the fraud will be imputed to him); *Long Island Lighting Co. v. Transamerica Delaval, Inc.,* 646 F.Supp. 1442, 1452 (S.D.N.Y. 1986). *See also Eichman v. Fotomat Corp.,* 759 F.2d 1434, 1438 (9th Cir.1985) ("[i]gnorance of evidence which should have been discovered does not negate the application of *res judicata*"). *Cf. Marine Midland Bank v. Smith,* 482 F.Supp. 1279, 1287 (S.D.N.Y.1979) (generally, there is a duty of inquiry and awareness placed upon a guarantor, and this duty is even greater when the guarantor is not an aloof and detached third party, but owns a considerable interest in the project for which he is a surety), *aff'd without opinion,* 636 F.2d 1202 (2d Cir.1980). Bin Saud has not alleged that he made any attempt during the pendency of the Guaranty Action to further ascertain the extent of BONY's participation in the fraud. Accordingly, the conclusory allegations of fraudulent concealment regarding BONY's particular role in the alleged fraudulent scheme do not insulate the RICO claim from *res judicata.*

■ Bin Saud also argues that the application of *res judicata* "would cause manifest injustice and contravene the very purpose for which the RICO statute were enacted," and claims that he did not have a full and fair opportunity to litigate the issue of a scheme to defraud in the Guaranty Action. The Court disagrees. RICO claims are not exempt from the application of *res judicata. E.g. Norman v. Niagara Mohawk Power Corp.,* 873 F.2d 634, 638 (2d Cir.1989). The record in the Guaranty Action indicates that Bin Saud was afforded every opportunity to present his claims against BONY and to litigate these claims in the context of that action. The court

specifically allowed Bin Saud the opportunity to open the default occasioned by his own decision to ignore the judicial proceedings involving his liability under the guaranty. The consequences of Bin Saud's decisions (1) to discharge his attorneys and fail to retain new counsel, (2) not to respond to the motion for summary judgment, (3) to submit only two letters to the court requesting that the default judgment be opened, (4) not to investigate his defenses further or articulate these defenses to the court, and (5) not to appeal the judgment entered against him, are his alone to bear. Having had a full and fair opportunity to litigate and appeal the judgment, there is no inequity in applying the long standing principles of *res judicata* to bar him from asserting a defense to the Guaranty Action as a separate RICO claim. *See e.g. Federated Department Stores v. Moitie, supra*, 452 U.S. at 401, 101 S.Ct. at 2429; *Henry v. Farmer City State Bank, supra*, 808 F.2d at 1232–35.

■ Finally, plaintiff contends that *res judicata* should not bar the RICO action since certain of the predicate acts which form the RICO claim had not occurred at the time of the Guaranty Action. This argument is unavailing. All of the events surrounding the guaranty, and all the allegedly fraudulent conduct that injured Bin Saud, occurred prior to the Guaranty Action. The allegations of other predicate acts of fraud by Fitzpatrick and BONY which injured third-parties cannot be used by Bin Saud to shelter from the application of *res judicata* the fraud claims arising from the same cause of action previously litigated in the Guaranty Action. To allow Bin Saud to proceed with his RICO claim would sanction the use of creative legal labelling and terminology as a means to defeat BONY's ability to rely on the rights it secured in the Guaranty Action. Such a result cannot be countenanced by the Court, as it would elevate form over substance and undermine the fundamental purposes behind the doctrine of *res judicata*.

## CONCLUSION

The fraud based RICO claim asserted against BONY is barred by *res judicata*.

Accordingly, BONY's motion to dismiss the amended complaint against it is granted. With regard to the claims against the other defendants, Bin Saud is directed to submit a status letter or a voluntary dismissal to the Court by April 19, 1990.

It is so ordered.