**Mishal Bin SAUD, Plaintiff–Appellant,**

v.

**The BANK OF NEW YORK,**
**Defendant–Appellee.**

**No. 572, Docket 90–7615.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 15, 1990.

Decided April 8, 1991.

Richard K. Bernstein (Richard K. Bernstein Associates, New York City, of counsel), for plaintiff-appellant.

Robert S. Carlson (Sarah S. Gold, Spengler, Carlson, Gubar, Brodsky & Frischling, New York City, of counsel), for defendant-appellee.

Before FEINBERG, PIERCE, and MINER, Circuit Judges.

---

PIERCE, Senior Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Southern District of New York, Robert J. Ward, *Judge,* dismissing an amended complaint upon defendant's motion to dismiss on the ground of *res judicata.* 734 F.Supp. 628.

Mishal Bin Saud ("Saud") alleges in his amended complaint that The Bank of New York ("the Bank") violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1988), when it acted in concert with its employee, Michael J. Fitzpatrick, and others to obtain profits through a pattern of racketeering activity that involved lending money in interstate commerce. The amended complaint further asserts that because of an alleged cover-up by the Bank of the improper conduct on the part of Fitzpatrick and others, Saud was induced to sign a personal guaranty for a $42 million real estate development loan. Following a default by the principal obligor of the loan, the Bank, in an earlier action, obtained a $19 million default judgment against Saud on his guaranty.

In this later action brought under RICO, Saud principally seeks to recover treble the amount of the default judgment against him and to enjoin the Bank from dissipating funds allegedly wrongfully obtained through a racketeering enterprise.

The Bank moved to dismiss Saud's amended RICO complaint on the ground of *res judicata,* arguing that Saud's RICO claims are barred by the earlier default judgment obtained by the Bank on Saud's guaranty. The district court agreed and dismissed Saud's amended complaint. Finding no just reason for delay, the district court certified this appeal as to the Bank[1] pursuant to Fed.R.Civ.P. 54(b). We affirm.

### I.

The pertinent factual background can be gleaned from the pleadings in the two ac-

tions and related documents. In or about 1980–81, loan negotiations took place between Fitzpatrick, on behalf of the Bank, and representatives of Indeco Holdings, Ltd. (a Bahamian corporation) and Indeco Holdings Solymar, Inc. (a Florida corporation) (the two entities are referred to hereinafter as "Indeco Holdings" and "Indeco Solymar" respectively, and collectively as "Indeco"). Indeco Solymar was wholly owned by Indeco Holdings, in which Saud and his partner, Lester Colodney, directly or indirectly each held substantial interests.

Saud sought the loans on behalf of Indeco Solymar to finance the development of a high-rise condominium in Miami, Florida, known as Solymar Place. By December 1982, several land acquisition and development loans had been disbursed by the Bank in connection with Solymar Place. After the various loans were consolidated, Indeco Solymar's total indebtedness to the Bank was $42 million. Upon the closing of the final loan on or about June 30, 1983, Saud executed a personal guaranty in favor of the Bank obligating himself for the full $42 million of the consolidated loans in the event of default by Indeco Solymar.

Indeco Solymar subsequently defaulted on the loan. Thereafter, in May 1984, the Bank brought a foreclosure action in state court in Dade County, Florida, naming the Indeco entities as defendants ("the Foreclosure Action"). Saud was not a defendant in the Foreclosure Action. Indeco Solymar consented to a final judgment in the Foreclosure Action, admitting its default under the loan in the amount of $24,398,086.43.

At the same time the Bank commenced the Foreclosure Action, it also brought suit against Saud on his guaranty in the United States District Court for the Southern District of New York ("the Guaranty Action"). Saud filed an answer in the Guaranty Action in which he asserted eight affirmative defenses against the Bank and impleaded

---

**1.** In addition to the Bank, defendants below included Fitzpatrick and "John Does 1–10." At the district court's direction, Saud voluntarily dismissed the action against these additional defendants so that an immediate appeal against the Bank could be certified under Fed.R.Civ.P. 54(b).

Indeco Solymar and Indeco Holdings, seeking indemnification and contribution.

Nearly three years later, in February 1987, the Bank moved for summary judgment. At Saud's request, Judge Robert W. Sweet, to whom the case was then assigned, adjourned the return date of the motion until April 17, 1987. Shortly before this date, however, Saud discharged his attorneys, failed to retain replacement counsel, and failed to submit any papers in opposition to the Bank's summary judgment motion. On April 21, 1987, the court granted the Bank's summary judgment motion on default, but provided that a motion to open the default would be heard if made on or before May 8, 1987.

On May 8, 1987, Alexander Aghayan, an attorney, wrote to Judge Sweet on Saud's behalf but "not as [Saud's] counsel of record," explaining the reasons for Saud's current unavailability and informing the court that Saud would be properly represented by counsel shortly. On May 22, 1987, two more letters, signed by Saud himself and dated May 19, 1987, were submitted to the court. Saud requested that the court treat the letters as motion papers and set forth his arguments for opening the default. After considering the letters, the court found no basis for opening the default and, on June 24, 1987, entered judgment in favor of the Bank against Saud in the principal amount of $19,071,196.51 plus interest. No appeal was taken from this judgment.

On January 9, 1989, Saud commenced this action under RICO seeking, *inter alia,* to recover treble the amount of the default judgment obtained by the Bank in the Guaranty Action and to enjoin the Bank from dissipating funds allegedly wrongfully obtained through a racketeering enterprise ("the RICO Action"). Saud named as defendants the Bank, Fitzpatrick, and John Does 1–10, representing employees of the Bank who allegedly were involved in negotiating, approving and supervising the loans and who "had substantial dealings with Fitzpatrick."

In the RICO complaint, Michael J. Fitzpatrick was identified as a loan officer at the Bank, who served at various times as treasurer, assistant vice-president and vice-president. Fitzpatrick allegedly negotiated and obtained the Bank's credit committee approvals for the Indeco Solymar loan transactions during 1981 and 1982. As of November 19, 1982, Fitzpatrick's employment at the Bank was terminated. According to Saud, Fitzpatrick, then a vice-president, was terminated because of his mishandling of the Indeco and other accounts. Saud contends that the Bank never conducted an investigation into Fitzpatrick's activities or filed a report with state bank officials and that this failure constituted part of an illegal cover-up by the Bank.

Saud specifically asserted, *inter alia,* that Fitzpatrick unlawfully diverted funds from the Indeco loan proceeds for his personal use and deposited them in a Panamanian bank account. Saud also alleged that the Bank knowingly failed to assure that certain pre-conditions required by the loan agreement were satisfied before obtaining Saud's personal guaranty and that the Bank sued Saud on his guaranty in furtherance of the Bank's alleged cover-up.

Saud further charged that the Bank was guilty of mismanagement in supervising Fitzpatrick and other loan officers and in monitoring the application of loan proceeds, willfully failing to notify borrowers and guarantors of wrongdoing by its officers of which the Bank was aware, and participating in a scheme to defraud amounting to a cover-up. This cover-up was alleged to have occurred not only in connection with the Indeco Solymar loans, but also in connection with unrelated loans made by the Bank for real estate development projects in New Jersey and Rhode Island. The Bank's conduct, according to Saud, violated both federal and state laws, in particular the provisions of RICO, 18 U.S.C. § 1962(a)–(c).

## II.

Under the doctrine of *res judicata,* "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated*

*Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981); *see Brown v. Felsen,* 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979); *NLRB v. United Technologies Corp.,* 706 F.2d 1254, 1259 (2d Cir.1983). *See generally* 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice ¶ 0.405 (2d ed. 1988) (discussing general *res judicata* principles). There is no dispute that Saud and the Bank were parties to the prior Guaranty Action.

The requirement that the prior judgment be a final judgment on the merits is also clearly met here. " 'A judgment of a court having jurisdiction of the parties and of the subject matter operates as *res judicata,* in the absence of fraud or collusion, even if obtained upon a default.' " *Morris v. Jones,* 329 U.S. 545, 550–51, 67 S.Ct. 451, 455, 91 L.Ed. 488 (1947) (quoting *Riehle v. Margolies,* 279 U.S. 218, 225, 49 S.Ct. 310, 313, 73 L.Ed. 669 (1929)); 1B J. Moore, J. Lucas & T. Currier, *supra,* at ¶ 0.409[4]. It is noteworthy that the default in this case did not occur because Saud failed to appear or answer after being properly served. Saud did appear and answer in the Guaranty Action—indeed, he asserted numerous affirmative defenses and impleaded two third party defendants. Saud's default occurred three years later when, after obtaining several adjournments, he failed to respond to the Bank's motion for summary judgment.

■ In determining whether the default judgment in the Guaranty Action may be given preclusive effect in this subsequent suit between the same parties, the question before us is whether the RICO claim asserted in this suit is one that was or could have been raised in the Guaranty Action. As the district court correctly recognized, it does not matter that a RICO claim was not expressly asserted in the Guaranty Action, "[f]or it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies." *Expert Elec., Inc. v. Levine,* 554 F.2d 1227, 1234 (2d Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977); *see also*

*In re Teltronics Servs., Inc.,* 762 F.2d 185, 193 (2d Cir.1985) ("[n]ew legal theories do not amount to a new cause of action so as to defeat the application of the principle of res judicata").

In *United Technologies,* we set forth the factors to be considered in determining the preclusive scope of a prior judgment. "Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and *whether the facts essential to the second were present in the first."* *United Technologies,* 706 F.2d at 1260 (emphasis added); *see also* Restatement (Second) of Judgments § 24 (1982) (subsequent claim precluded under *res judicata* when it arises from same transaction).

We believe the presence in the Guaranty Action of the facts essential to Saud's RICO claims is amply demonstrated by Saud's submissions in the Guaranty Action. To begin with, in the Guaranty Action, Saud asserted eight affirmative defenses. In the first affirmative defense, Saud claimed that the Bank "made the first advance and all subsequent advances under the Building Loan Agreement with the knowledge that none of the above-mentioned conditions to [the Bank's] obligation to make the first advance had been satisfied." In the fourth affirmative defense, Saud asserted that "a substantial portion of the monies advanced by [the Bank] to Solymar under the Building Loan Agreement were not used for construction, as provided for under the Building Loan Agreement." Saud also alluded to the Bank's having "permitted such diversion of advances, ostensibly dedicated to construction under the Building Loan Agreement, to improve [the Bank's] position as mortgagee." Thus it appears that the essential facts alleged in support of Saud's RICO claims, i.e., allegedly fraudulent conduct by the Bank in connection with the Indeco loans, were not only present in the earlier Guaranty Action, but raised therein by Saud himself.

Saud seeks to avoid the application of *res judicata* by attempting to distinguish the fraud alleged as an affirmative defense in the Guaranty Action and the fraud alleged as the basis of his RICO claim. According to Saud, the two frauds are "qualitatively different" and relate to different phases of the loan transaction. He characterizes the fraud alleged as the basis of the RICO claim as having occurred *before* the loan proceeds were distributed and as relating to the activity of the Bank and its employees at that time, particularly the Bank's alleged failure to see that the conditions required under the Bank's loan agreement were satisfied before the loan funds were disbursed. Thus, according to Saud, "the RICO fraud to the extent it concerns the Indeco transaction goes to the inducement of the loan."

The Guaranty Action fraud, Saud maintains, relates to an alleged collusion between Saud's partner, Lester Colodney, and Fitzpatrick, occurring primarily *after* the distribution of the loan proceeds. The focus of this fraud was the desire of Colodney and Fitzpatrick to divert funds from the loan proceeds for their personal gain. The Bank's culpability in this fraud was alleged to be "nothing more" than a "serious breach of [the] duty of care" in the Bank's alleged failure to monitor the loan proceeds.

Saud's attempt to draw fine distinctions between the types of fraud in the two actions is unavailing. As noted above, it is "the *factual* predicate of the several claims asserted" that determines whether *res judicata* will apply, not a litigant's ability to devise a new legal theory. *See Expert Elec.*, 554 F.2d at 1234 (emphasis added). Saud's defenses to the Guaranty Action and his RICO claims asserted herein are both based on alleged fraudulent conduct occurring in connection with the Indeco Solymar loans. As noted above, an examination of Saud's affirmative defenses in the Guaranty Action belies Saud's claim that the two frauds are "qualitatively different." Both are based on broad allegations of fraud in connection with the same loan transaction.

Saud also claims that *res judicata* does not apply because the facts underlying the

RICO Action were not known and not capable of being discovered at the time of the Guaranty Action. To support this argument, Saud makes much of the fact that Fitzpatrick was convicted of bribery and distribution of bribery proceeds in federal court in Rhode Island in October 1988. This conviction arose from Fitzpatrick's mishandling, purportedly in a manner similar to that Saud alleges in connection with the Indeco loans, of unrelated real estate development loans the Bank made in Rhode Island. Fitzpatrick's Rhode Island conviction, we are told, led to an investigation by Saud and to his unearthing of evidence of Fitzpatrick's mishandling of the Indeco loans and the alleged knowing participation by the Bank.

We are not persuaded by this argument. As a general rule, newly discovered evidence does not preclude the application of *res judicata*. *See Guerrero v. Katzen*, 774 F.2d 506, 508 (D.C.Cir.1985). Exceptions to this rule exist when the evidence was either fraudulently concealed or when it could not have been discovered with due diligence. *Id.* However, neither of these exceptions is relevant herein, since we believe that even without the alleged newly discovered evidence, Saud had sufficient notice at the time of the Guaranty Action of the essential facts that are now alleged in support of his RICO complaint.

During the pendency of the Guaranty Action, Saud repeatedly demonstrated his awareness of the possibly fraudulent nature of the Indeco loan transactions. First, as noted above, several of Saud's affirmative defenses to the Guaranty Action were based on allegations of fraud. Further evidence of Saud's awareness appears in an affidavit submitted by his attorney in support of Saud's application for a stay of the Guaranty Action pending the outcome of the contemporaneous Foreclosure Action in Florida. The affidavit asserted that since most of the issues in the Guaranty Action had already been presented in the Foreclosure Action and would be resolved there, the Guaranty Action should be stayed.

A careful reading of that affidavit reveals the following about the extent of Saud's awareness in 1985: 1) that the Indeco entities in the Foreclosure Action had

counterclaimed against the Bank alleging, *inter alia,* unspecified *fraudulent misrepresentation;* 2) that one Mohammed Jebai, an alleged interest holder, filed an answer in the Foreclosure Action asserting, *inter alia,* that the Bank was estopped from pursuing foreclosure because of unspecified *wrongful conduct* by the Bank's officers in handling the underlying loan; and 3) that the J. Barney Corp., a general contractor for the Solymar Place project, had intervened in the Foreclosure Action and asserted claims of breach of contract, unjust enrichment and unspecified *fraud* against both the Bank and Indeco Solymar. In January 1986, the motion for a stay of the Guaranty Action was denied by Judge Sweet with leave to renew.

Still further evidence of the extent of Saud's knowledge of the potential fraud is found in Saud's letter motions to open the default judgment entered in the Guaranty Action. In one of these letters, Saud stated:

> I have now been advised (*although I have long suspected this*) that the 400,-000 U.S. Dollars [brokerage fee purportedly due the Bank] was paid by Lester Colodney ["my ex-associate"] to one Michael Fitzpatrick, then an officer of the Bank of New York and the Account Manager for the loan ... and that this payment was made to a Panamanian Company ... and that this Company opened a Miami Bank Account, with Fitzpatrick and Colodney as the signatories. It would appear that *there has been a conspiracy* between Lester Colodney and this official of the Bank of New York, which has caused considerable harm to my interests. (emphasis added).

He further stated:

> [I]t would seem to be *no coincidence* that the Bank approved the loan without the other collaterals, relying only on my guarantee, without my being informed of this. It has been *apparent that other Bank of New York Officers were aware of this situation* and in looking into this matter further, it has come to light that the same Michael Fitzpatrick made a further similar arrangement after leaving the Bank of New York ... providing further unsecured loans to Lester Colod-

ney.... *As a result of this conspiracy,* I understand now that my efforts to seek assistance from the Bank of New York in verifying the funds drawn down by Lester Colodney for the purpose of the Solymar Project were of little avail.... [I]n the circumstances of the relations between Lester Colodney and the Officers of the Bank (who appear to have been dismissed in the meantime) I consider there has been a *serious breach of a duty of care by the Bank,* which would go to reduce considerably the amount of money that could be rightfully claimed by the Bank against me, on the basis of my guarantee. (emphasis added).

Significantly, in these letters, Saud stated that he had "long suspected" wrongdoing on the part of Fitzpatrick and that his understanding of Fitzpatrick's conduct was that Fitzpatrick had engaged in a "conspiracy" that caused "considerable harm to [Saud's] interests." In addition, Saud stated that it was apparent that other officers of the Bank knew of the situation and that he suspected that the Bank's approval of the loan, despite Indeco Solymar's failure to provide "other collaterals," was "no coincidence." Saud pointed out that similar fraudulent schemes by Fitzpatrick were revealed after he left the bank in 1982. Consequently, Saud concluded, because of this "conspiracy," his efforts to gain assistance from the Bank regarding the matter were unavailing.

It is clear to us, in view of Saud's submissions in the Guaranty Action and Saud's statement that he "long suspected" that fraudulent conduct by the Bank and Fitzpatrick may have occurred, that Saud could have actively pursued the allegations of fraud he raised as a defense to the Guaranty Action. Moreover, as the district court found, even if Saud did not know the full extent of the Bank's alleged fraud at the time the Guaranty Action was commenced, his pleadings in that suit demonstrated that he had sufficient information to create a duty of further investigation. *See Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983); *see also Eichman v. Fotomat Corp.,* 759 F.2d 1434, 1438 (9th Cir.1985). Indeed, given the substantial amount of money at stake in the Guaranty Action,

Saud had a strong incentive to actively litigate his defense and further uncover evidence of fraud. Having failed to undertake that inquiry, Saud is chargeable with full knowledge of the fraud.

We note in closing that Saud's allegations in the RICO Action refer to additional real estate development loans—unrelated to Indeco Solymar—made by the Bank to finance projects in New Jersey and Rhode Island. These allegations were apparently included by Saud in his complaint in an effort to establish a "pattern" of racketeering sufficient to satisfy RICO requirements. Saud has no apparent connection to these loans. Since it is evident that these allegedly fraudulent transactions are relevant only to state a litigable RICO claim, which we have found barred under *res judicata*, we need not consider these assertions further.

Accordingly, since we agree with the district court that all of the issues relating to the Guaranty Action are foreclosed from further prosecution on the ground of *res judicata*, we affirm the dismissal of Saud's RICO Action.

Affirmed.