**BANQUE FRANCO–HELLENIC DE COMMERCE INTERNATIONAL ET MARITIME, S.A., Plaintiff,**

v.

**Orestes CHRISTOPHIDES, Defendant.**

**No. 93 Civ. 0295 (LBS).**

United States District Court, S.D. New York.

Nov. 17, 1995.

---

184

Kasowitz, Hoff, Benson, Torres (Hector Torres, Ruth Ilan, Michael C. Harwood, of counsel), New York City, for Plaintiff.

Thomas V. Dana, New York City, for Defendant.

SAND, District Judge.

This action arises out of defendant Orestes Christophides' refusal to remit to plaintiff Banque Franco the payment to which it believes it is entitled by virtue of defendant's contract to serve as guarantor on a loan now in default. Plaintiff Banque Franco ("the Bank") argues that this is a simple and straightforward action in which the Bank is entitled to judgment under absolute, unconditional guaranties of payment made by Christophides. While the Court agrees with plaintiff that it is entitled to payment under the guaranties, we believe this case is anything but simple and straightforward.

## BACKGROUND

In early 1990, Levant Line S.A. ("Levant") was a privately-held Liberian corporation that operated a cargo vessel liner service between ports in the United States and the Mediterranean and Black Seas (Kokkinos Moving Aff. ¶ 4). At that time, the shareholders of Levant formed two privately-held shipping corporations known as Paralos Maritime, S.A. ("Paralos") and Pelagic Shipping, S.A. ("Pelagic"), for the purpose of purchasing two vessels, the Levant Spirit and the Levant Pride, and chartering them to the Levant Line. (Kokkinos Moving Aff. ¶ 15). Needing funds to procure the ships, the shareholders of Levant [1] were in contact with more than ten banks to request a loan. However, all of the banks were unwilling to extend a multi-million dollar loan with the aged Levant Spirit and Levant Pride ships as collateral. (Reply Affidavit of Thomas Dana in Further Support of Defendant's Cross Motion, "Dana Reply Aff." Ex. G, Mamoulakis Aff. ¶¶ 5 and 6; Affidavit of Thomas Dana in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross–Motions "Dana Aff." Valiotis Aff. ¶ 16; Skoufalos Supp.Aff. ¶ 7). Apparently the Levant Pride and the Levant Spirit were twenty years old and in serious need of repair at the time Levant solicited funds to purchase the ships. (Dana Aff., Skoufalos Deposition, Ex. 5 at 16.)

After receiving many rejections, Levant was finally able to secure a loan with plaintiff Banque Franco ("the Bank"). Pursuant to an agreement dated May 24, 1990, the Bank loaned Paralos and Pelagic $5,700,000 to finance the purchase of the two vessels. (Affidavit of Ruth Ilan, sworn to March 6, 1995 "Ilan Reply Aff"; Bank's 3(g) statement ¶ 10).

Defendant Christophides has produced convincing evidence that this $5.7 million loan was secured through the payment of a bribe. In May 1990, after several rejected loan applications, Levant's directors met with Spiros Aspiotis ("Aspiotis"). Aspiotis was not an employee of Banque Franco, however he was

---

1. The shareholders of Levant Line, Paralos and Pelagic at that time were Demetrios Bekas, Efstathios Valiotis, Peter Xenopoulos, Efstratios Skoufalos and Demetrios Dememetrios. (Kokkinos Moving Aff. ¶ 5 n. 3)

able to arrange a meeting between Levant and the manager of the Bank's ship loan department, Mr. Trivyzas. Aspiotis accompanied two Levant directors, Valiotis and Skoufalos to the meeting with Trivyzas. After a 30 minute meeting and without inspecting the vessels, Trivyzas approved the loan. (Dana Aff.Ex. 4, Valiotis Deposition at 236; Kokkinos Reply Aff. ¶ 10). Valiotis and Skoufalos were "surprised" that the loan was approved so quickly after other banks had refused their requests. (Valiotis Aff. ¶ 17).

After Trivyzas approved the loan, he told the Levant directors that he would leave the room and that all arrangements should be made with Aspiotis. Upon Trivyzas' departure, Aspiotis told Valiotis and Skoufalos that in order to obtain the loan, five percent of the face value of the loan, or $285,000, would have to be paid to Aspiotis and Trivyzas as a "facilitation fee". (Dana Aff.Ex. 5, Skoufalos Deposition at 19, 93; Ex. 3, Valiotis Aff. ¶ 18). This "hush money" and "under the table money" was to be deposited into an account at Ergobank in Piraeus, Greece and not at the Bank. (Skoufalos Dep at 19, 21). When Levant received the $5.7 million loan, Valiotis wired $285,000 to an account at the Ergobank under the name "Hamilton Enterprises, S.A." (Dana Aff.Ex. 4, Valiotis Dep. at 280, 286). While Valiotis paid the bribe without the knowledge of the other directors at Levant, the payment "eventually became common knowledge amongst directors of the Levant Group." (Mamoulakis Aff. ¶ 7).

Six months after the $5.7 million was granted, Levant advised the Bank that the addition of a third vessel to Levant Line's service would enhance the operation of the shipping line and improve its cash flow. (Oates Deposition "Oates Dep.", Ilan Moving Aff.Ex. 6 at 87–89). Apparently, Levant could not repay portions of the existing loan as they became due. (Plaintiff's Response to Defendant's Statement Pursuant to Rule 3(g) ¶ 10). Seeking some way to rectify the situation, Levant sent a letter to the Bank dated December 5, 1990, stating that it was "in the process, of negotiating the participation of a third vessel into [their] liner service." (Ilan Moving Aff.Ex. 5)

On January 8, 1991, Levant reached a preliminary agreement with Defendant Christophides to employ a third ship, the Levant Fortune in Levant's shipping line. (Ilan Moving Aff.Ex. 7). The Levant Fortune was to be chartered to Levant Line for four years at a rate equivalent to amortization, interest and the running cost of the Levant Fortune. The net profits from the operation of the ship would be shared equally between Levant Line and the owner of the Levant Fortune. (Ilan Moving Aff.Ex. 7; Skoufalos Dep.). At the time of the preliminary agreement, Christophides did not own the Levant Fortune; rather the ship was to be auctioned on February 6, 1991.[2]

In anticipation of the auction, Christophides began to seek financing to purchase the ship. Deciding that he would establish a shell corporation for the sole purpose of holding title to the Levant Fortune, Christophides began to solicit funding for his new corporation, Silver Anchor. Christophides first contact with Banque Franco was during a January 10, 1991 meeting. On that date, Levant's chief executive officer, Efstratios Skoufalos introduced Christophides to Banque Franco's Kevin Oates. (Def. 3(g) ¶ G; Oates Dep., Ilan Moving Aff.Ex 6 at 87). At that meeting the parties discussed potential financing for the Levant Fortune. However the auction had not yet taken place so Silver Anchor could not provide any concrete terms and "nothing was concluded." (Christophides Dep., Ilan Moving Aff.Ex. 1 at 374–376). Throughout the meeting, Kevin Oates stated that he did not have the authority to commit the Bank's funds, but rather could only take down the information and present it to those Bank officers who could. (id.). In response to Oates' statements, Christophides indicated that he would attempt to purchase the Levant Fortune, even without the Bank's assistance. (Ilan Moving Aff.Ex. 14 and 6 at 100.).

As a follow-up to the January 10 meeting, Kevin Oates sent a letter dated January 24, 1991 to Christophides which included the following:

2. The auction was postponed at the last minute from January 6, 1991 to February 6, 1991.

"the Bank is pleased to respond positively to your provisional request for finance. Of course the matter cannot progress further until a formal request for finance is received from you and I realize that you will not know fully details until the auction in late February." (Ilan Moving Aff.Ex. 15)

On February 6, 1991, Christophides successfully bid for the Levant Fortune on behalf of Jet.[3] While Christophides was not a shareholder in Jet, on April 15, 1991, Jet would transfer its interest in the Levant Fortune to Silver Anchor. (Kokkinos Aff. ¶ 18 n. 12).

With ownership of the Levant Fortune in place, Christophides contacted the Bank on February 7, 1991, one day after the auction. Christophides advised Kevin Oates and George Kokkinos, the Bank's new shipping manager, that he had successfully bid $2.4 million for the Levant Fortune, and requested a loan in the amount of 65% of the value of the Levant Fortune. (Kokkinos Moving Aff. ¶¶ 7–10). After extensive negotiations, the parties set forth the following proposed financing terms that would be presented to the Bank's Credit Committee for approval: (1) a term loan of $1,700,000; (2) a short-term working capital facility of $300,000; (3) various terms of security for the proposed Silver Anchor Loan including a first mortgage in the ship; (4) a guaranty from Christophides for the $2 million loan; (5) two cross-collateralization provisions concerning (a) a guaranty by Silver Anchor of Levant Line's previous $5.7 million loan and a second mortgage on the Levant Fortune as security for that guaranty, and (b) guaranties by Paralos, Pelagic, and Levant Line of Silver Anchor's $2 million loan and second mortgages on the Levant Pride and Spirit as security for those guaranties. (Kokkinos Moving Aff. ¶ 12).

Two weeks after the auction, Silver Anchor and Levant Line executed a formal charter-party agreement for the exclusive use of the Levant Fortune by the Levant Line (the "Charterparty"). (Ilan Moving Aff.Ex. 8).

The terms of the Charterparty were negotiated on February 22, 1991, between Christophides and Levant Line, without any involvement of the Bank. (Christophides Dep., Ilan Moving Aff.Ex. 1 at 313; Kokkinos Reply Aff. ¶ 8). Under the agreement, Levant Line had full control of the Levant Fortune for the entire duration of the Charterparty, and Silver Anchor could not utilize the vessel outside of Levant's service or direct its employment in any way. (Ilan Moving Aff.Ex. 8; Christophides Dep., Ilan Moving Aff.Ex. 1 at 280–81).

With the charterparty agreement in place and the Levant Fortune purchased, Banque Franco issued its commitment letter for the $2 million loan to purchase the Levant Fortune on March 12, 1991. One week later, on March 19, 1991, Silver Anchor was incorporated by Christophides for the sole purpose of holding title to the Levant Fortune. (Kokkinos Moving Aff. ¶ 8 and Ex. E and I; Bank's 3(g) Statement ¶ 5; Defendant's Statement Pursuant to Rule 3(g) ¶ B). Christophides took a 25% ownership and was pronounced a director and president of the privately-held Panamanian corporation. (Defendant's Statement Pursuant to Rule 3(g) ¶ 3).

On April 12, 1991, Christophides (on behalf of Silver Anchor) and the Bank executed the $2 million loan agreement to finance the purchase of the Levant Fortune. (Kokkinos Moving Aff.Ex. K). Contemporaneously with making the $2 million loan to Silver Anchor, the Bank restructured Levant Line's $5.7 million loan by modifying the repayment schedule. As a result of the restructuring, the $5.7 million loan was no longer in default. (Kokkinos Reply Aff.Ex. D ¶ C).

The $5.7 million loan to Levant and the $2 million loan to Silver Anchor were cross-collateralized. Silver Anchor (but not Christophides) guarantied the $5.7 million loan and Silver Anchor provided the bank with a second preferred mortgage on the Levant Fortune as security for its guaranty of that loan. (Kokkinos Reply Aff.Ex. D. § 4(b)). Similar-

---

3. Christophides was not a shareholder in Jet. Jet is a corporation wholly owned by Alex Ciaputa, an acquaintance of Christophides. Jet paid a $450,000 deposit for the Levant Fortune. On April 15, 1991, Jet transferred its interest, which it acquired at the auction, in the Levant Fortune to Silver Anchor. (Kokkinos Aff. ¶ 18 n. 12)

ly, Paralos and Pelagic provided the Bank with guaranties of the Silver Anchor $2 million loan as well as a second preferred mortgage on the Levant Spirit and the Levant Pride as security for their guaranties. (Kokkinos Moving Aff.Ex. K § 10.04).

In addition to the cross-collateralization guaranties, Christophides personally guarantied Silver Anchor's $2 million loan. (Kokkinos Moving Aff.Ex. J). Paragraph 3 of the Guaranty provides:

> The obligations of the Guarantor hereunder are independent of any other guaranty of or security for the Loan now or hereafter made and are absolute and unconditional irrespective of the genuineness, legality, validity, regularity or enforceability of the Loan Agreement or any Note or any other document, instrument or agreement contemplated therein.... The Guarantor waives any rights the Guarantor may have to require the Lender first to proceed against or enforce any guaranty or security of, or claim payments from the Borrower or any other person before claiming from the Guarantor under this Guaranty as well as, the benefit of any statute of limitations affecting the Guarantor's liability hereunder or the enforcement hereof as well as any other circumstance or provision of law which might otherwise constitute a defense or discharge of the guarantor or hinder prompt enforcement of the Guaranty ...

In addition to this guaranty, Christophides furnished the Bank with another personal guaranty in the Loan Agreement itself. (Kokkinos Moving Aff.Ex. K at 34–36). This guaranty stated:

> The obligations of the Guarantors hereunder shall be absolute and unconditional irrespective of the validity, legality or enforceability of any and all the terms and provisions hereof and of the other Security Documents as against the Borrower and shall not be affected by any action taken hereunder in the exercise of any right or power herein conferred or by any failure or omission to enforce any right conferred hereby or by any of the other Security Documents or by any waiver or covenant or condition herein provided ... or by any

circumstance whatsoever (with or without notice to or knowledge of the Guarantors) which may or might in any manner or to any extent vary the risk of the Guarantors or might otherwise constitute a legal or equitable discharge of a surety or guarantor, it being the purpose and intent that the Guarantee and liability of the Guarantor hereunder ... shall be absolute and unconditional under any circumstances.

Three months after the guaranties were signed and the $2 million loan dispersed, Silver Anchor failed to repay a $300,000 working capital facility when it was due in July 1991. In October 1991, Silver Anchor again failed to make principal and interest payments on the other $1.7 million. (Kokkinos Moving Aff. ¶ 25). Christophides admitted that Silver Anchor did not repay the $2 million loan and stated that the defaults occurred because Levant Line did not pay Silver Anchor the agreed charter hire pursuant to the Charterparty. (Kokkinos Moving Aff. Ex. M; Ilan Moving Aff.Ex. 1 at 514). By a letter dated February 13, 1992, the Bank served formal notice of the defaults on Christophides and Silver Anchor in accordance with the provisions of the Loan Agreement. In a letter dated June 12, 1991, the Bank notified Silver Anchor and Christophides that the Bank intended to demand full payment of the $2 million loan and to arrest the Levant Fortune unless Silver Anchor cured its defaults. (Kokkinos Moving Aff. ¶ 27, 25). In that month, the Bank arrested the Levant Fortune in Piraeus, Greece and auctioned the ship on May 5, 1993 for $1,801,000. (Affidavit of Eliana Paschalides, sworn to December 14, 1994, ¶ 11, 27).

This action is before the Court on a stipulated record, the parties having agreed that the Court is free to resolve any disputed issues of material fact. *See* Transcript, April 20, 1995 at 4–10. Banque Franco seeks a judicial determination that it is entitled to monies that it believes it is due under the $2 million Silver Anchor loan and Christophides' guaranty of that loan. The Defendant raises eleven affirmative defenses and counterclaims which detail why he should not have to pay. Those claims include: fraud in the inducement, illegality, deceit, duress, coer-

cion, failure to mitigate damages, interference with economic relations and prospective advantage, promissory estoppel, equitable estoppel and unjust enrichment. Three of these defenses give us pause.

## I. Cross–Collateralization

■ Defendant Christophides argues that the $2 million Silver Anchor loan was induced by fraud on the Bank's part and its execution forced upon the defendant by the Bank's duress and coercion. According to defendant, Christophides requested a loan to purchase the Levant Fortune that was separate from the previous $5.7 million loan. In reliance thereon, and with the knowledge of the Bank, Christophides bid for the Levant Fortune and paid the auction Court Marshal a deposit. Returning to the Bank after the auction, Christophides claims that the Bank, exercising extreme duress and coercion, introduced, *de novo,* conditions that he cross-collateralize the Levant Fortune loan with that of the Spirit and the Pride. Arguing that if he did not yield to the Bank's pressures, he would forfeit his auction downpayment, Christophides signed the loans. However, he now moves the Court to void the loan contract based upon its purported fraudulent inducement, duress and coercion.

Christophides' contention cannot stand. The essence of Christophides' argument is that the Bank defrauded him by purportedly agreeing, at the January 10 meeting to provide financing pursuant to regular terms, and subsequently required cross-collateralization provisions. First, Christophides admitted during his deposition that the parties did not reach any agreement on January 10, 1991. (Christophides Dep. at 374–376). According to his own testimony, "nothing was concluded at the meeting" with respect to the financing terms. (Id. at 376). Instead the parties discussed only general and provisional information. Indeed, Kevin Oates' letter to the Defendant specifically states that "the matter cannot progress further until a formal request for finance is received and I realize that you will not know full details until the

auction at late February." (Ilan Moving Aff. Ex. 15). Second, Christophides was not relying upon monies from the Bank when he bid at the auction. Indeed, Christophides made known his intentions to purchase the Levant Fortune even if unable to obtain financing from the Bank. (Ilan Aff.Ex. 14; Ex. 1, Christophides Dep. at 393). Third, Christophides knew before he signed the loan documents that the Bank would not make a ship loan to a single asset company. (Defendant's Statement Pursuant to Rule 3(g) ¶ C). Silver Anchor was from its inception until its bankruptcy a single asset company. (Defendant's statement pursuant to Rule 3(g)). Therefore, Christophides must have had some idea that the Bank would require some other assets as security for extending the loan.[4] Fourth, after Christophides had full knowledge of the cross-collateralization terms, he did not attempt to seek alternative financing from any other bank. (Christophides' Response No. 14 to Bank's Contention Interrogatories, Ilan Moving Aff.Ex. 11). Christophides explained that it was in Silver Anchor's best interest to obtain a loan from Banque Franco, based upon his belief that the Bank had some familiarity with Levant and had mortgages on the vessels of Paralos and Pelagic (the Levant Pride and the Levant Spirit). (Christophides Dep., Ilan Moving Aff., Ex. 1 at 278).

Perhaps most detrimental to defendant's contention is the fact that *Citibank v. Plapinger,* 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985), bars defendant from raising any defense that his loan was induced by a fraudulent misrepresentation made prior to the signing of the contract. Under *Plapinger,* a guarantor who provides an "absolute and unconditional" guaranty with a specific disclaimer clause cannot thereafter assert counterclaims that were specifically barred by the guaranty. In that case, Citibank sought summary judgment against the directors of a corporation whose loan they had personally guarantied. The defendant directors alleged that the guaranties were in-

---

**4.** Indeed Christophides' admitted that "at no time was I offered by the bank a ship loan which was not cross-collateralized with the Levant ships and the Levant loans; neither at the prior

meetings of January 10, 1991 and February 7, 1991, nor in the Bank's latter to me of January 24, 1991." (Dana Aff.Ex. 6 ¶ 15).

duced by a prior oral representation by Citibank that it would provide the borrower an additional line of credit, and that by not funding that line of credit, Citibank breached its commitment and defrauded the guarantors. Having signed a contract with no mention of the additional line of credit, the defendants continued to argue that they relied on the representations regarding the credit line and would never have entered into the guaranty had they known the representations would not have come to fruition.

Thus, like Christophides, the defendants in *Plapinger* argued that they were fraudulently induced to enter the guaranty based upon a prior oral representation. *Plapinger* directors alleged an oral promise of an additional line of credit; Christophides alleges an oral promise of a loan without cross-collateralization. However, unlike *Plapinger*, Christophides was never promised a separate loan; he merely thought that since no cross-collateralization terms were originally mentioned, no cross-collateralization terms would be required. Indeed, Christophides has stated that at "no time was I offered by the bank a ship loan which was not cross-collateralized with the Levant ships and the Levant loans." (Christophides Supp. Aff, Dana Aff.Ex. 6 ¶ 15). Additionally, like Christophides' unconditional guaranties, the *Plapinger* guaranties provided that they was "absolute and unconditional ... irrespective of (i) any lack of validity ... of the ... Restated Loan Agreement ... or any other agreement or instrument relating thereto", or "(vii) any other circumstance which might otherwise constitute a defense" to the guaranty.

Holding that the "absolute and unconditional" guaranty recitals were inconsistent with the guarantors' claims of reliance upon an oral representation that Citibank was committed to extend to the corporation an additional line of credit, the New York Court of Appeals found that in such instances the unconditional terms of the guaranty control.[5]

■ Here too, we find that the unconditional guaranty defeats defendant's reliance upon alleged prior oral representations that were not embodied in the contract document. The loan contract specifically details the cross-collateralization and surety provisions. Defendant was represented by an attorney in signing the contract and there is no suggestion that defendant did not understand the nature of the document or the cross-collateralization terms to which he affixed his signature. While the mere phrase "absolute and unconditional" is not enough in itself to preclude a fraudulent inducement defense, a prior oral representation that is inconsistent with the specific language of the guaranty cannot defeat the contract.[6]

## II. Fraudulent Concealment and Misrepresentation

■ Defendant Christophides alleges that the Bank concealed material facts from defendant and made written misrepresentations of material fact in order to induce defendant to sign the personal guaranties that are the subject of this litigation. Arguing that because he relied on these misrepresentations and because the Bank's silence led defendant to sign guaranties he would not have signed had plaintiff been forthright, Christophides claims that he was fraudulently induced to sign the guaranties and that they are voidable under New York law. Christophides cites four fraudulent concealments and misrepresentations. First, the Bank concealed from defendant the fact that the $5.7 million Levant loan was in default. Second, the Bank represented in writing that the $5.7 Levant loan was not in default and had never been in default. Third, the Bank concealed from defendant the fact that the $5.7 million Levant loan was the product of a commercial bribe. Fourth, the Bank misrepresented in writing that no bribes or commissions had been paid by Levant to obtain the $5.7 million loan.

5. *See also, Caisse Nationale de Credit Agricole v. Valcorp Inc.*, 1992 WL 245500, at *4 (S.D.N.Y. Sept. 17, 1992) (the parol evidence rule "provides that a party may not offer evidence of a prior oral or written agreement to alter or contradict the unambiguous terms of a written integrated contract").

6. *See Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310 (2d Cir.1993); *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959).

### The Default:

As discussed *supra,* Christophides produces convincing evidence of Levant's inability to meet its obligations on its $5.7 million loan. Christophides was introduced to Banque Franco as someone who could enhance the operation of the Levant shipping line and improve its cash flow by providing an additional third vessel to charter. (Oates Dep., Ilan Moving Aff.Ex. 6 at 87–89; Ex. 5). However, Christophides alleges that he was not told that the Levant loan was ever in default. Indeed, he points to the fact that the Bank placed language into the Silver Anchor $2 million loan which denies a previous default on the $5.7 million loan. Paragraph 8.07 contains the borrower's representation and warranty:

> that at the time of making, executing and delivering this Agreement all above representations and warranties and any other information given by the Borrower and/or any one of the Guarantors to the Lender are true and accurate and *there has not occurred* and/or is continuing any Event of Default or any event which constitute an event of default with the passage of time or the giving of notice or both. (emphasis added).

The Bank admits that sometime after May 24, 1990, Levant was "not current on repaying their loan." (Plaintiff's 3(g)). However, they point to the fact that as of January 8, 1991 the Bank already had agreed to modify the payment schedule for the $5.7 million loan and on April 12, 1991 when the $2 million loan was signed, Paralos and Pelagic had paid $250,000 to the Bank, there were no other amounts due and the loan was performing. (Kokkinos Rep.Aff. ¶ 13 and Ex. C; ¶ 14). Therefore, when Christophides signed his $2 million loan and the concomitant cross-collateralization and guaranty provisions, the $5.7 loan was not in default.

Christophides argues that despite the fact that the $5.7 million loan was current when he signed, the Bank perpetrated a fraud by attempting to conceal the default through its silence and went a step further by placing in the contract written clauses that explicitly represented that Levant was not, and had never been, in default. Arguing that a previous default impacts tremendously on assessing the risk undertaken by the cross-collateralization and personal guaranty provisions, Christophides cites paragraphs 11.03 and 14.01.21 of the $2 million loan agreement directing that a default by Levant on its $5.7 million loan would trigger defendant's obligation on his personal guaranty. Christophides relies on *First Citizens Bank and Trust Co. of Utica v. Sherman,* 250 App.Div. 339, 345, 294 N.Y.S. 131 (4th Dept.1937), which holds that "a concealment of facts which, if known to the surety, would have deterred him from entering into the contract of suretyship, or which increased the risk of his undertaking, constitutes fraud, and will prevent an enforcement of his obligation." Christophides asserts that as Levant had already defaulted on its $5.7 million loan only a short time after securing it, the risk of further default was high, and the concealment of those facts constitute a fraud.

Christophides' reliance on *First Citizens Bank and Trust,* is misplaced, for in citing the case Christophides ignores ¶ C of the Addendum to the $5.7 loan which was executed by him at the same time he executed his guaranties. ¶ C explicitly discloses the default:

> The Borrowers [Paralos and Pelagic] are in default under the Loan Agreement by virtue of their failure to pay, inter alia, an installment of principal when due and the Borrowers and the Guarantors have asked the Bank to reschedule the repayment of the Loan. (Addendum dated April 12, 1991, to a Loan Agreement dated 24th May 1990, ¶ C, Kokkinos Rep.Aff.Ex. D).

Thus, defendant was on notice of both the default and the restructuring agreement aimed at curing the default.

Similarly, Christophides conceded that since February 1991, several months before he executed the guaranties in April 1991, he knew that Levant was experiencing financial difficulties. When asked at his deposition, "The owners of the Spirit and the Pride, did you know that they were not current in repaying their loan to Banque Franco Hellenique?," Christophides answered, "I didn't find that out until perhaps February." (Ilan

Reply Aff.Ex. 1, Christophides Dep. at 293). These statements demonstrate that the Bank did not defraud defendant. Christophides knew of the risk and cannot now contradict his own testimony by arguing that he was fraudulently induced to enter a contract whose risk was greater than he originally anticipated. Therefore, defendant's fraudulent inducement defense fails on the facts of the case, irrespective of the absolute and unconditional nature of his guaranties.

**The Bribe:**

█ As discussed *supra*, Christophides raises two claims of fraudulent inducement concerning the bribe. First, he claims fraudulent inducement by the Bank's concealment of the bribe. Second, he claims fraudulent inducement through written misrepresentations embodied in the contract itself. Joining these two assertions, Christophides produces convincing evidence of a bribe.

Under his concealment claim, Christophides asserts that after being rejected by more than ten banks, Levant secured a $5.7 million loan with Banque Franco after a thirty minute meeting and without any inspection by the Bank of the collateral (the Levant Pride and Spirit). (Dana Aff.Ex. 4, Valiotis Dep. at 236; Kokkinos Reply Aff. ¶ 10). As Trivyzas left the room he told the Levant directors that all arrangements should be made through Aspiotis. Aspiotis then told Skoufalos and Valiotis that in order to obtain the loan a five percent "facilitation fee" would have to be paid to Trivyzas and Aspiotis. This "hush money" and "under the table money" amounted to $285,000 and was wired to Ergobank. (Dana Aff.Ex. 5, Skoufalos Dep. at 19, 21, 93; Ex. 3, Valiotis Aff. ¶ 18). While Valiotis paid the bribe without the knowledge of the other directors at Levant, the payment "eventually became common knowledge amongst directors of the Levant Group." (Mamoulakis Aff. ¶ 7).

Defendant bolsters his claim of fraudulent inducement by arguing that not only did the Bank conceal the bribe through its silence, but it went a step further by affirmatively placing misrepresentations in writing that no bribes or commissions had been paid by Levant to obtain the $5.7 million loan. Grounding his argument in the contract itself, Christophides cites Paragraph 5.3 of the Associated Loan Agreement [7]:

> "Neither the execution nor delivery of this Agreement or of the Security Documents nor the transactions herein or therein contemplated nor compliance with the terms and conditions hereof or thereof will:
>
> > (a) contravene any provision of law, statute, decree, rule or regulation to which any Borrower or the Corporate Guarantor is subject of any judgment, decree, franchise, order or permit applicable to any of them;"

Additionally, Paragraph 8.4 of the $2 million loan agreement drafted by the Bank contains the following representation by the borrowers and guarantors:

> "that there are and will be no commissions, rebates, premiums or other payments by or to or on account of any one or more of the Borrower and Guarantors or any of the Shareholders in connection with the purchase of the New Vessel or the Charterparties other than as already disclosed to the Lender in writing."

Christophides asserts that had he known of the bribe he would have been deterred from signing the personal guaranties for two reasons. First, on ethical grounds, Christophides states that he would not have wanted to associate himself with a criminal transaction. Second, knowledge of the bribe would have disclosed to the defendant that the Levant shipping line was not at all creditworthy because 1) it could secure a loan only with a bribe and 2) even with a bribe it could not repay its loan. Thus Silver Anchor's loan, and Christophides' personal guaranty of it were highly risky transactions inasmuch as the Silver Anchor loan agreement and cross-collateralization provisions provided that a default by Levant under its $5.7 million loan agreement constitutes a default by Silver Anchor under its loan agreement. Christophides asserts that he was falsely induced to

---

7. The Associated Loan Agreement is the agreement for the $5.7 million loan on May 24, 1990. This agreement is incorporated by reference in the $2 million Silver Anchor loan agreement of April 12, 1991.

enter a loan obligation whose risk was much greater than the facts known to him suggested.

In its defense, Banque Franco argues that Christophides' "absolute and unconditional" guaranties bar his fraudulent inducement claim. Arguing that the *Plapinger* doctrine applies, Banque Franco asserts that when a guarantor has provided an unconditional guaranty in which the guarantor generally waives defenses to the enforcement of all related loan documents, the guarantor is precluded from later asserting he was fraudulently induced to execute the guaranty in reliance on any misrepresentation.

■ *Plapinger* does not extend that far. Parol evidence of fraud in the inducement is admissible to vitiate a guaranty. However, parol evidence of fraud in the inducement will be inadmissible when the guaranty itself contains a disclaimer of reliance on the specific oral representation later raised as a vitiating factor, or where an absolute and unconditional guaranty specifically waives any claim of reliance on representations other than those made in the loan documents. *Citibank v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985); *Manufacturer's Hanover Trust Co. v. Yanakas*, 7 F.3d 310 (2d Cir.1993); *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959).

In the case at hand, *Plapinger* is not applicable. Christophides does not claim that he relied on the Bank's oral representations; rather, he claims that he relied on the written representations in the contract itself.[8] As such Christophides' absolute and unconditional guaranties do not bar his fraudulent inducement claim. It therefore becomes essential to analyze defendant's fraudulent inducement claim in light of the alleged fraudulent concealments and misrepresentations.

■ The test for fraudulent concealment by a surety bond obligee under New York law consists of four elements: 1) the obligee must know facts that materially increase the surety's risk, and have reason to believe that surety would be unwilling to assume such a higher risk; 2) the obligee must have reason to believe that such facts are unknown to the surety; 3) the obligee must have the opportunity to communicate the relevant information to the surety; and 4) the obligee must have the duty to disclose the information based upon its relationship to the surety, its responsibility for the surety's misimpression, or other circumstance. *Rachman Bag Co. v. Liberty Mutual Insurance Company*, 46 F.3d 230, 237 (2d Cir.1995).

■ Plaintiff Bank asserts that Christophides' defenses fail under criteria 4 because it was under no duty to disclose information to defendant. In general, it is the duty of sureties "to look out for themselves and ascertain the nature of the obligations." *Security Nat'l Bank v. Compania Anonima De Seguros*, 21 Misc.2d 158, 190 N.Y.S.2d 820, 823 (Sup.Ct.1959), aff'd 10 A.D.2d 872, 199 N.Y.S.2d 532 (1960). Christophides testified that he learned of rumors of a bribe two months before he executed the Silver Anchor loan. (Ilan Reply Aff.Ex. 1 at 452–457). On the February 7, 1991 meeting between Christophides, Skoufalos, Kevin Oates and George Kokkinos, the defendant knew that Kokkinos replaced Trivyzas after the former shipping manager left "under very unfavorable circumstances." (Ilan Reply Aff.Ex. 1 at 453). Given the allegations, it was Christophides' duty to inquire as to the veracity of the rumors regarding the alleged bribe. Christophides, however, failed to make any inquiry whatsoever.

Since Christophides failed to exercise due diligence in executing his loan agreements,

---

8. *See, Turkish v. Kasenetz*, 27 F.3d 23 (2d Cir. 1994) (holding the rule of law prohibits a party from relying on oral representations where the contract specifically disclaims the existence of such representations; but the doctrine does not apply to reliance on written representations of the contract); *Chase v. Columbia National Corp.*, 832 F.Supp. 654 (S.D.N.Y.) 1993) (Plapinger not applicable because defendant relied on a written term of the contract); *GTE Automatic Electric v.*

*Martin's Inc.*, 127 A.D.2d 545, 512 N.Y.S.2d 107 (1st Dept.1987) (*Plapinger* concerned question of when parol evidence can be introduced to prove fraudulent oral representation which induced the contract); *Goodridge v. Fernandez*, 121 A.D.2d 942, 505 N.Y.S.2d 144 (1st Dept.1986) (*Plapinger* not applicable because the defendant is not seeking "the introduction of parol evidence to establish terms inconsistent with the written contract").

the question might arise whether the Bank's silence amounts to fraud. If this case revolved around the issue of when an obligee's silence concerning material facts constitute fraud, the Court would have to rely on New York case law holding that silence on the part of an obligee will amount to fraud only where the obligee had an affirmative duty to tell what it allegedly withheld and that this duty arises "where the parties enjoy a fiduciary relationship" or "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank,* 731 F.2d 112, 123 (2d Cir.1984); *In re Gas Reclamation,* 1991 WL 275756 (S.D.N.Y.); *Marine Midland Bank v. Smith,* 482 F.Supp. 1279, 1288 (S.D.N.Y.1979).[9]

But this case does not revolve around silence. Rather written misrepresentations were made. Banque Franco included language in its $5.7 million loan that the transaction did not contravene any provision of law and later incorporated by reference that agreement into the $2 million loan. (Associated Loan Agreement ¶ 5.3). Additionally, the Bank drafted Paragraph 8.4 of the $2 million loan agreement stating that there were no commissions associated with any of the loans. Sufficient evidence exists to establish that the bank had knowledge of the bribe prior to the Christophides guaranty so that we conclude that these representations were fraudulent.

■ Given the fraud, the principal question of law in this case becomes under what circumstances do fraudulent concealments and written misrepresentations vitiate a contract. To succeed on a defense or claim of fraudulent inducement one must prove: 1) there was a misrepresentation of material fact; 2) the misrepresentation was intended to induce the reliance of another party; 3) reliance was induced; 4) the reliance caused the other party damages. *Aries Ventures Ltd. v. Axa Finance S.A.,* 729 F.Supp. 289, 298–99 (S.D.N.Y.1990).

■ For reasons stated *supra,* the Court finds that the first three factors are satisfied. There was a misrepresentation of the material fact. Plaintiff not only concealed the act of bribery, but also went a step further by affirmatively placing written misrepresentations in the loan documents. These misrepresentations form the basis of information on which defendant relied when assessing the risk of his business venture and affixing his signature to a $2 million loan contract. Thus, Christophides' fulfills the first three criteria by proving that his reliance was intentionally induced by a misrepresentation of material fact.

Christophides' claim of fraudulent inducement fails, however, due to his inability to satisfy the fourth criteria, namely that his reliance on the misrepresentation caused his damages. Believing that the $5.7 million loan and the $2 million loan are inextricably bound and therefore, that fraud in the first contract will vitiate the second contract, Christophides devotes great attention to detailing the connection between the two loans. The thrust of his argument is that but for the bribe, the $5.7 million loan would not have been made, and had the $5.7 million loan failed to materialize, the entire transaction involving the three vessels would have never taken place. Christophides contends that the 2.0 million loan and the defendant's guaranty of that loan were designed by the Bank in order to insure repayment of the bribe-induced $5.7 million loan. In an effort to bolster his argument, Christophides meticu-

---

9. The affirmative duty to disclose is distinct from the other three parts of the fraudulent concealment test. The fact that obligee knew facts that materially increase the guarantor's risk, had reason to believe that such factors are unknown to the guarantor, and had the opportunity to communicate the information does not give rise to an affirmative duty to divulge. *Rachman Bag Co. v. Liberty Mutual Insurance,* 46 F.3d 230, 236 (2d Cir.1994). Rather, the test would be an examination of several factors including whether the obligee dealt directly with the guarantor, wheth-

er the silence would amount to an affirmative misrepresentation, whether the principal was the obligee's employee or agent, whether the obligee has unique access to material information and whether the obligee colluded in the principal's deception. *Marine Midland,* 482 F.Supp. at 1286–87; *Damon v. Empire State Surety Co.,* 161 A.D. 875, 146 N.Y.S. 996 (1914); *General Crushed Stone Co. v. State,* 19 N.Y.2d 737, 279 N.Y.S.2d 190, 225 N.E.2d 893 (1967); *Grumman Allied Indus. v. Rohr Indus.,* 748 F.2d 729 (2d cir.1984); *Rachman Bag,* 46 F.3d at 237.

lously references all instances of linkage. Two of the most salient provisions occur in paragraph 14.01.21 of the Silver Anchor $2.0 million loan agreement which state that a default in the $5.7 million loan automatically triggers a default in the $2.0 loan and the defendant's guaranty of that $2 million loan. Thus, Christophides' obligation to pay on his personal guaranty would arise if Levant defaulted on its bribe-induced $5.7 million loan from the Bank.

 The problem with Christophides' argument is that although there is a connection between the $2.0 million loan and the $5.7 million loan, for the purposes of this case, the connection is irrelevant. Illegality, in the form of bribery, serves as a defense only if it has a "causative connection" to the event causing the loss. *Messersmith v. American Fidelity Co.,* 187 A.D. 35, 175 N.Y.S. 169, 172 (4th dept.1919). The causal connection between the bribe-induced $5.7 million loan and the subsequent default on the $2 million loan is much too attenuated. Simply stated, Christophides guaranty obligations were triggered because of Silver Anchor's failure to pay its own $2 million loan. (Kokkinos Aff. ¶ 25–27). They were not triggered by the status of Levant's $5.7 million loan. Silver Anchor failed to repay the short-term loan of $300,000 in July 1991 when it was due, and it did not make any principal or interest payments on the remaining $1.7 million loan when those payments were due. To this date, Silver Anchor has not repaid any of the $2 million it received to enable it to purchase the Levant Fortune. (id.). Christophides is before the Court because he guarantied a loan that Silver Anchor did not pay back. The connection between the bribe-induced $5.7 million loan and the $2 million loan did not cause the defendant's loss. Silver Anchor's inability to repay its loan caused the defendant's loss.

Bribery will not vitiate a contract where the purported illegality does not relate directly to the loss. *Waldron v. British Petroleum Co.,* 231 F.Supp. 72, 92 (S.D.N.Y.1964) aff'd 361 F.2d 671 (2d Cir.1966); *In re Storch's Estate,* 53 N.Y.S.2d 409, 411 (Surr.Ct.Kings Co.1945). Defendant Christophides has failed to prove that his reliance

on the misrepresentation concerning bribery caused his damage. Thus, plaintiff is entitled to repayment of the loan with interest.

Plaintiff is to submit thirty days from the date hereof an order on notice detailing the issue of damages, specifically the amount of principal owed less auction proceeds and the amount of interest accrued.